648 So.2d 692 (1994)
Charlie THOMPSON, Appellant,
v.
STATE of Florida, Appellee.
No. 81039.
Supreme Court of Florida.
November 23, 1994.
Rehearing Denied January 25, 1995.
*693 James Marion Moorman, Public Defender, and Paul C. Helm, Asst. Public Defender, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen., and Robert J. Krauss and Carol M. Dittmar, Asst. Attys. Gen., Tampa, for appellee.
PER CURIAM.
Charlie Thompson appeals his convictions of two counts of first-degree murder and his two death sentences. We have jurisdiction pursuant to article V, section 3(b)(1), of the Florida Constitution. For the reasons expressed in this opinion, we affirm the convictions and death sentences.
The record reveals the following facts. The appellant, Charlie Thompson, was a groundskeeper at Myrtle Hill Cemetery in Tampa. Although he was a large man, about six feet tall and weighing 220 pounds, Thompson injured his back while digging a grave and began collecting workers' compensation benefits through the cemetery's office. After the workers' compensation benefits ran out, Thompson persisted in his belief that the *694 cemetery owed him $150 more than he had collected. Thompson was fired from his job at the cemetery in July of 1986 for failing to show up for work.
In the early afternoon of August 27, 1986, the bodies of Russell Swack and Nancy Walker were found in a wooded area near the Myrtle Hill Cemetery. Swack was the bookkeeper for the cemetery and Walker was his assistant. A medical examination revealed that Swack had been stabbed nine times and shot once in the face. All of the injuries had been inflicted while Swack was alive. The medical examination of Walker established that she had been shot once in the back of the head. A watch and ring were missing from Swack's body.
One of the managers of the cemetery testified that he had last seen Swack and Walker at about ten o'clock on that same morning and that the victims were speaking with a large unidentified man in the cemetery's business office. The witness also stated that he left the office and that, when he returned about fifteen minutes later, the victims were gone and the office door was locked.
A search of the office revealed that Walker's purse was under her desk and her typewriter was still turned on. In addition, Swack's adding machine was left on and a bookkeeping ledger was on Swack's desk. The last entry in the ledger, dated that same day, was for a check payable to Charlie Thompson in the amount of $1,500.
Several witnesses, including the mother of Thompson's children, testified that Thompson had a watch and a ring in his possession on the afternoon and evening of the crime. The watch and ring were recovered and identified as belonging to Swack. Two days after the crime, Thompson was arrested when an alert car salesman contacted the police after Thompson and three others attempted to purchase a used car with the $1,500 check from Myrtle Hill Cemetery.
At Thompson's trial for the murders, the State presented this and other evidence to the jury, including the testimony of a jailhouse informant who stated that Thompson admitted killing Swack and Walker. Thompson presented no witnesses in his defense. The jury found Thompson guilty of two counts of first-degree murder and two counts of kidnapping. In the penalty phase of the trial, the defense presented two psychologists who testified as to Thompson's mental deficiencies. Thompson's sister also testified to a history of mental illness in the family. After hearing this testimony, the jury recommended the death penalty for each murder by a 7-to-5 vote. The court found the following six aggravating factors: prior felony conviction; murder committed while engaged in a kidnapping; murder committed to avoid arrest; murder committed for pecuniary gain; murder especially heinous, atrocious, or cruel; and murder committed in a cold, calculated, and premeditated manner. The court found that the evidence failed to establish extreme mental or emotional disturbance and substantially impaired capacity, but did give some weight to nonstatutory mitigating factors including chronic mental illness, moderate disturbance, symptoms of mental illness, family background, and mental retardation.
The court sentenced Thompson to death for each murder and to consecutive life sentences for each kidnapping. Thompson appeals seven issues to this Court.

The Guilt Phase
The only guilt phase issue presented by Thompson is whether the trial court erred in denying Thompson's motion for mistrial after a witness for the State responded to defense counsel's questioning with a clearly hearsay-based answer that Thompson alleges was non-responsive. Herman Smith, the grounds supervisor at the cemetery, testified on cross-examination that, although he had not seen Thompson at the cemetery on the day of the murders, his crew members saw Thompson go into the victim's office with a gun. The trial judge immediately sent the jury out of the courtroom and consulted the attorneys. Defense counsel asked for a curative instruction and then, on reflection, expressed doubt concerning the effectiveness of a curative instruction and moved for a mistrial. The judge denied the motion and gave a curative instruction.
Thompson argues that Smith's testimony was both inadmissible hearsay and *695 non-responsive to the questions asked by defense counsel. He also asserts that the curative instruction was ineffective, especially as this was the only eyewitness identification testimony presented. In response, the State admits that Smith's testimony was hearsay; however, the State asserts that the error was "invited" because Smith's hearsay statement was in response to a question asked by defense counsel. We agree with the State. The following exchange took place between the witness and the defense attorney on cross-examination concerning whether the witness saw the defendant at the cemetery on the morning of the murders:
Q. Did you see Mr. Thompson at the cemetery?
A. No. Everybody that appeared there know Mr. Thompson because he was working in my crew at the time.
Q. I'm not arguing with you about that, Mr. Smith, and I don't want you to think that I am. Can you just answer this question for me? On August 27th 1986, did you at any point in time while you were working on that day see Charlie Thompson on the grounds of the Myrtle Hill Cemetery?
A. My crew have told me he was at that time. I got to explain myself.
Q. No, sir. Just tell me this: Did you, sir, see Thompson on August 27th at the cemetery? Did you see him?
A. No, sir, but my crew did. My crew did.
Q. When did your crew see him?
A. I was the foreman out there this particular day. They was there working at the office when they seen Mr. Thompson go in there and carry Mr. Swack and Ms. Nancy. They said he had a gun in his pocket.
THE COURT: Take the jury out.
Although we can sympathize with the defense attorney's frustration in questioning a less than sophisticated witness, it is apparent from the record that this damaging hearsay response was invited by defense counsel's question. We note that the witness had already stated twice that he himself had not seen Thompson when counsel asked the question, "When did your crew see him?" Furthermore, the defense attorney initially told the trial judge that there was no need for a mistrial and that a curative instruction would suffice. The State did not utilize the hearsay testimony at any point throughout the remainder of the trial, and we specifically note no mention of it in final argument. We find that the trial judge did not err in refusing to grant a mistrial under these circumstances. Upon review of the entire record, we find that the evidence is more than sufficient to support Thompson's convictions, and we affirm the two convictions of first-degree murder.

The Penalty Phase
Thompson raises six penalty phase issues. First, Thompson asserts that the State failed to prove four of the six aggravating factors beyond a reasonable doubt: avoid arrest; pecuniary gain; heinous, atrocious, or cruel; and cold, calculated, and premeditated. We find that the evidence supports the court's finding of these aggravators.
To establish the avoid arrest aggravator in this case, "the State must show that the sole or dominant motive for the murder[s] was the elimination of ... witness[es]." Preston v. State, 607 So.2d 404, 409 (Fla. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1619, 123 L.Ed.2d 178 (1993). "[T]his factor may be proved by circumstantial evidence from which the motive for the murder[s] may be inferred." Id. Once Thompson had obtained the $1,500 check from Swack and Walker, there was little reason to kill them other than to eliminate the sole witnesses to his actions. This factor is clearly supported by the evidence. We also reject Thompson's argument that the pecuniary gain aggravator does not apply in this case and that this factor is inconsistent with the avoid arrest aggravator. There is ample evidence in the record to prove that Thompson benefitted financially from these murders. Furthermore, we have previously held that it is proper for a trial court to utilize both the pecuniary gain and avoid arrest aggravators. See Preston, 607 So.2d at 409.
We also find that there was sufficient evidence to support the trial court's finding *696 that each murder was heinous, atrocious, or cruel. Swack was stabbed numerous times before he was shot. Also, both victims undoubtedly suffered great fear and terror for some time prior to their murders. In the sentencing order, the trial judge stated:
After obtaining a check to which he was not entitled, the Defendant forced the victims to go in one of the victim's cars to a park and then walk to a secluded wooded area. The Defendant was armed with a knife and a gun. The victims were forced to disrobe. The female victim was then allowed to redress. While clothed only in his underwear and shoes and socks, the male victim struggled with the Defendant and was stabbed nine times in various parts of his body. While the victim was still alive, the Defendant shot him in the head. The female victim was lying face down on the ground with her head on her arm. The autopsy revealed a bite mark to her arm that was inflicted while she was alive and aware of her impending death which came from a gunshot to her head. It is unclear which victim was killed first, but it is clear that both were aware for some period of time that the Defendant intended to kill them.
We have previously found that these type of facts support a finding of the heinous, atrocious, or cruel aggravating factor. See, e.g., Hardwick v. State, 521 So.2d 1071 (Fla.) (heinous, atrocious, or cruel factor upheld where the victim was stabbed repeatedly, then shot and beaten), cert. denied, 488 U.S. 871, 109 S.Ct. 185, 102 L.Ed.2d 154 (1988); Preston, 607 So.2d at 410 ("Fear and emotional strain may be considered as contributing to the heinous nature of the murder, even where the victim's death was almost instantaneous.").
Finally, we find that there is sufficient evidence from which the trial judge could find that the murders were cold, calculated, and premeditated. Thompson took the precaution of carrying a gun and a knife with him to the cemetery office. After he had obtained the check from Swack, he drove the victims to an isolated area and forced them to lie on the ground. Further, there is no indication that Walker resisted Thompson although Thompson and Swack did struggle with each other. Cf. Swafford v. State, 533 So.2d 270, 277 (Fla. 1988) ("The cold, calculated, premeditated murder, committed without pretense of legal or moral justification, can also be indicated by such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course."), cert. denied, 489 U.S. 1100, 109 S.Ct. 1578, 103 L.Ed.2d 944 (1989).
In his second penalty phase issue, Thompson asserts that the "committed during the course of a felony" and "cold, calculated, and premeditated" aggravating factors are unconstitutionally broad. These issues are procedurally barred because Thompson failed to object to these aggravating factors at trial. See, e.g., Espinosa v. State, 626 So.2d 165 (Fla. 1993), cert. denied, ___ U.S. ___, 114 S.Ct. 2184, 128 L.Ed.2d 903 (1994); Steinhorst v. State, 412 So.2d 332, 338 (Fla. 1982) ("Except in cases of fundamental error, an appellate court will not consider an issue unless it was presented to the lower court.").
In his third penalty phase issue, Thompson argues that the trial judge erred in failing to find and weigh mitigating evidence including mental or emotional disturbance, impaired capacity, brain damage, and drug and alcohol abuse. The trial judge expressly addressed the mental issues presented by the evidence and stated:
Statutory Mitigating Factors
1. The capital felony was committed while the Defendant was under the influence of extreme mental or emotional disturbance.
The testimony of one of the psychologists was to the effect that the Defendant does and did at the time of the offense suffer from "significant" mental or emotional disturbance, that this is a chronic mental illness that will never go away. This statutory mitigating factor was not established by the evidence, but the defendant's chronic mental illness was given some weight by the Court as a nonstatutory, mitigating factor.
2. The capacity of the Defendant to appreciate the criminality of his conduct and *697 to conform his conduct to the requirements of law was substantially impaired.
The testimony of one of the psychologists established that the Defendant's ability to conform his conduct to the requirements of law was impaired, but that his capacity to appreciate the criminality of his conduct was not impaired. Therefore, this statutory mitigating circumstance was not established. However, the Court gave some weight to this testimony that the Defendant was moderately disturbed and exhibited some symptoms of mental illness as a nonstatutory, mitigating circumstance.
Non-Statutory Mitigating Factors
The Court has considered the following non-statutory, mitigating factors.
1. Family Background
The testimony of one of the defendant's sisters showed that the Defendant was born in Mississippi; had twelve siblings; his mother died when he was seven years old and his father died when he was 22. The Defendant was born in 1950, making him 36 years old at the time of the offense. The Defendant's sister loves him. The Defendant has a brother and a sister who have both been in mental institutions. The Court gave this family background little weight.
2. Mental Retardation
The testimony of two psychologists established that the Defendant suffers an intellectual deficit and is mildly retarded. This non-statutory, mitigating circumstance was given considerable weight by this Court.
The Court has very carefully considered and weighed the aggravating and mitigating circumstances found to exist in this case, being ever mindful that human life is at stake. The Court finds, as did a majority of the jury, that the aggravating circumstances present in this case outweigh the mitigating circumstances present.
We note that, as stated in the sentencing order, the trial judge gave "considerable weight" to the fact that Thompson suffers "an intellectual deficit and is mildly retarded." While a trial judge must consider all mitigating evidence that is supported by the record, it is not error for the judge to fail to delineate all such evidence in the sentencing order. See Lucas v. State, 568 So.2d 18 (Fla. 1990). In the absence of a specific request by Thompson's counsel that the judge address a specific mitigating factor, we find no error. We conclude that the trial judge's consideration of the mitigating evidence presented by Thompson complies with the requirements set out in Campbell v. State, 571 So.2d 415 (Fla. 1990).
In his fourth penalty phase issue, Thompson asserts that it is a violation of the state and federal constitutions to execute a mentally retarded defendant. Evidence produced by the defense established that Thompson is mildly retarded with an IQ of 70. There was also testimony that on the revised intelligence scale Thompson scores between 56 and 63. Testimony also revealed that Thompson has very low intellectual functioning, a psychotic disturbance, brain damage, a history of drug abuse, delusions and hallucinations. In Penry v. Lynaugh, 492 U.S. 302, 340, 109 S.Ct. 2934, 2958, 106 L.Ed.2d 256 (1989), the United States Supreme Court found that execution of the mentally retarded does not violate the cruel and unusual punishment prohibition of the Eighth Amendment to the United States Constitution. The Court cautioned, however, that such a factor must be considered as a mitigating circumstance. Id. This Court has not established a minimum IQ score below which an execution would violate the Florida Constitution. We have, however, elected to follow the approach suggested by the United States Supreme Court and treat low intelligence as a significant mitigating factor with the lower scores indicating the greater mitigating influence. In the instant case, the trial judge gave "considerable weight" to Thompson's retardation. It is apparent that the jury also gave this evidence considerable weight in view of its 75 vote to recommend the death penalty. However, the trial court also found that "the aggravating circumstances present in this case outweigh the mitigating circumstances present." We find that the trial judge properly considered the fact of Thompson's low intelligence as a mitigating factor.
*698 The fifth issue is whether Thompson's death sentences are disproportionate. Proportionality review by this Court "guarantees that the reasons [justifying the death penalty] present in one case will reach a similar result to that reached under similar circumstances in another case... . If a defendant is sentenced to die, this Court can review that case in light of the other decisions and determine whether or not the punishment is too great." State v. Dixon, 283 So.2d 1, 10 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). We find that the facts of this case warrant the death sentences imposed and that the sentences are proportionate to other sentences of death affirmed by this Court.
The sixth and final penalty phase issue raised by Thompson is whether it is unconstitutional for a jury to be allowed to recommend death on a simple majority vote. Thompson admits that this issue has already been decided by this Court contrary to his position. See Brown v. State, 565 So.2d 304, 308 (Fla.), cert. denied, 498 U.S. 992, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990). We reaffirm our decision in Brown and find no error.
Accordingly, we affirm Thompson's two convictions of first-degree murder and his two sentences of death.
It is so ordered.
GRIMES, C.J., OVERTON, SHAW and HARDING, JJ., and McDONALD, Senior Justice, concur.
KOGAN, J., concurs in part and dissents in part with an opinion.
KOGAN, Justice, concurring in part, dissenting in part.
While I concur with the majority's discussion as to Thompson's conviction, I dissent from its affirmance of the death penalty. The very low IQ of this defendant together with substantial mitigating evidence reveals Thompson to be both mentally retarded and seriously mentally disturbed. As stated by Chief Justice Barkett in Hall v. State, 614 So.2d 473, 479-82 (Fla. 1993) (Barkett, C.J., dissenting), death is not a proper penalty based on such facts as these.