813 So.2d 68 (2002)
Donny L. CROOK, Appellant,
v.
STATE of Florida, Appellee.
No. SC94782.
Supreme Court of Florida.
March 7, 2002.
*69 James Marion Moorman, Public Defender, and Steven L. Bolotin, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Candance M. Sabella, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
Donny L. Crook, who was convicted of first-degree murder, robbery with a deadly weapon, and sexual battery with great force, appeals his sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm Crook's convictions, but vacate the death sentence and remand for resentencing.

GUILT PHASE
Crook, who was twenty years old at the time of the crimes, was convicted of the murder of fifty-nine-year-old Betty Spurlock, which occurred on March 14, 1996. The jury voted to impose the death penalty by a bare majorityseven to five.
Crook does not raise any guilt-phase issues on appeal and does not contest his convictions. Nevertheless, we review the evidence in this case because we have an independent obligation to review the sufficiency of the evidence and because of the requirement that we perform an independent proportionality review.
The victim was the co-owner and operator of the Bull Penn Bar ("bar"). Her body was discovered lying behind the bar by the bar's other co-owner at 8:45 p.m. The bar's cash drawer was missing from the cash register. Spurlock suffered multiple stab wounds and significant head injuries. The medical examiner testified that a pool cue had been inserted into the victim's vagina, but he stated that Spurlock likely was unconscious at that time.
Crook was seen in the bar both in the early afternoon and in the evening of the day of the murder. In the evening, a witness saw Crook sitting on his bicycle in front of the bar with a case of beer. Crook was last seen in the bar at approximately 8:15 p.m. sitting on a bar stool in front of Spurlock.
Authorities arrested Crook the next day on suspicion that he was involved in the murder. Subsequent DNA analysis determined that blood found on Crook's T-shirt was consistent with Spurlock's blood. During his time in police custody, Crook also admitted that he was present at the bar.
Although Crook did not confess to killing Spurlock or taking the money from the cash register, Crook admitted that he had *70 been drinking alcohol and using cocaine on the day of the murder and "wanted rock." Crook stated that he had "seen [Spurlock] counting money. And I turned around and everything went black." Crook informed the detectives that after seeing Spurlock lying on the floor naked with blood everywhere, he "got scared," ran out the front door of the bar, and rode his bicycle to his cousin's house where he changed his clothes. Also, a correctional officer testified he overheard Crook telling his brother, James Crook, who was visiting Crook in jail, that he "hit her in the head.... The money wouldn't come out. I was banging it on concrete but it wouldn't open. I got pissed off and hit her in the face."
At the conclusion of the guilt phase, the jury convicted Crook of first-degree murder, sexual battery with great force, and robbery with a deadly weapon.[1]

PENALTY PHASE
During the penalty phase, Crook's mother and three expert witnesses testified on Crook's behalf. Because of the significance of the mental mitigation to the claims on appeal, we set forth the testimony of Crook's mother and the experts in further detail.
Crook's mother testified that Crook had a difficult childhood. She stated that her first husband abused her and her children. In addition, as a migrant worker, Crook's mother explained that she was forced to move her family frequently. As a result, her children "didn't make it to school very often" and were left to care for themselves for long periods of time. She stated that at age four, Crook was severely beaten with a pipe and that he sustained additional head injuries as a child. She stated that by age twelve Crook began using alcohol and drugs and sniffing paint. She further explained that Crook also had problems in school: he failed kindergarten; could not sit still in class; was placed on Ritalin; frequently fought with other children; and was "thrown out" of several schools. According to his mother, Crook had attended ten different schools by the time he reached sixth grade and finally dropped out of school in eighth grade.
Further, expert witnesses testified that Crook suffered from frontal lobe brain damage and characterized Crook's intellectual abilities as falling within the "borderline mentally retarded" range. According to the experts, Crook had a history of sustained brain trauma, learning disabilities, severe behavioral problems, alcohol and drug abuse, parental neglect, and socioeconomic deprivation. The experts based their opinions on a battery of neuropsychological, psychological, and personality tests administered to Crook, clinical evaluations of Crook, interviews with Crook's mother, a review of Crook's life history, school records, medical records, and an examination of the evidence in this case.
In particular, Dr. McCraney, a boardcertified neurologist with substantial experience in diagnosing brain injuries, stated that Crook suffered from an impulse control disorder or organic brain syndrome affecting Crook's frontal lobe. Dr. McCraney's examination consisted of a review of Crook's life history, a neurological examination, and testing to determine how Crook's brain was functioning. Dr. *71 McCraney concluded that Crook was paranoid and impulsive, and that his difficulty arose as a result of organic brain dysfunction rather than any character disorder. He testified that his testing revealed abnormalities regarding the frontal lobe. Dr. McCraney characterized Crook's brain in layman's terms as "broken" and concluded that Crook's ability to process data was slower than normal. Dr. McCraney also found evidence in Crook's records dating back to his early school years that Crook was mildly mentally retarded, had a learning disability, and suffered from impulsivity from a very early age.
In addition to testimony concerning Crook's borderline intellectual abilities and explanations of the causes and origins of Crook's frontal lobe brain damage, Dr. McCraney testified that the circumstances of the crime were consistent with the experts' diagnoses of frontal lobe brain damage. For example, Dr. McCraney testified that people with frontal lobe brain damage often lose control over their own behavior and are prone to certain types of "rage" attacks as the frontal lobe works as a "braking mechanism for human behavior." According to Dr. McCraney, one of the major characteristics of a "rage" attack is that "the intensity of violence appears to have no relationship with the inciting event." Dr. McCraney, who testified that he was not aware of the details of the homicide at the time of his evaluation and diagnosis of Crook, further explained that people with frontal lobe brain damage
will fly into rage at the drop of hat. They may be provoked, although the provocation may be so minor that it's difficult for an observer to establish a relationship.
Observers report that these people are almost animalistic in the way they look. They get this fire in their eyes. They start frothing at the mouth and they just go nuts. I mean, they tear up the house. They whip up on whoever is in the immediate vicinity. Afterwards, when they calm down, they typically claim they don't remember anything about what happened. And the patient's claim of lack of memory often seems real credible.
Dr. McCraney testified that Crook was under the influence of an extreme mental or emotional disturbance at the time he committed the crime, and that his brain damage was responsible for this. Dr. McCraney concluded that the circumstances surrounding the homicide were consistent with his diagnosis of frontal lobe brain damage, stating, "[T]he events do appear to conform to this blind animalistic rage that's described with the orbital frontal syndrome."
Similarly, Dr. Dolente, a licensed clinical psychologist with substantial experience in neuropsychology and brain injury rehabilitation, also testified that Crook suffered from frontal lobe brain damage. Dr. Dolente reached this conclusion after conducting diagnostic testing, including standard neuropsychological testing, and reviewing Crook's medical records. Dr. Dolente explained that, although there were various documented accidents in the records that could have accounted for Crook's brain damage, the most significant accident appeared to have been a well-documented head injury at age five when he was hit in the head with a pipe. After that time, the records document that Crook switched from being right-handed to left-handed, he was found not to be tracking visually, he was clumsy, and he was lethargic-all signs of a significant neurological impairment following brain injury.
Dr. Dolente stated that due to Crook's frontal lobe brain damage, Crook had difficulty in controlling his behavior and was *72 prone to impulsive and aggressive behavior, including "rage." Dr. Dolente stated that Crook's brain damage would cause him to become excited easily, overreact, and, in certain situations, Crook would be unable "to control himself to a degree that a person with an intact brain would be able to." Dr. Dolente diagnosed Crook as suffering from a personality change disorder, secondary to a recurrent traumatic brain injury with antisocial features, polysubstance abuse, and attention deficit hyper-activity disorder. Dr. Dolente stated that Crook's "personality and attention deficit disorders were secondary to his brain damage with aggressive and impulsive features."
Dr. McClain, a general and forensic psychiatrist, testified that Crook suffered from frontal lobe brain damage arising from a combination of causative factors. After examining Crook and reviewing Crook's prior medical records, psychological evaluations, hospital records, and school records, Dr. McClain concluded that the following five factors in Crook's life history contributed to cause Crook's brain damage: (1) genetic factors; (2) socioeconomic deprivation; (3) head trauma; (4) substance abuse; and (5) and birth trauma. Dr. McClain explained that all of these factors interacted with each other, resulting in Crook's brain damage. Dr. McClain diagnosed Crook as having a severe antisocial personality disorder, secondary to a combination of brain damage, severe socioeconomic circumstances, head trauma, and substance abuse. Dr. McClain concluded that Crook's brain damage would "render him hypersensitive to the usual negative effects of alcohol and other drugs."
Regarding the statutory mental mitigating circumstances, Dr. McClain concluded that Crook was under extreme mental or emotional distress at the time of the offense:
His ability to think clearly and appreciate these things, in my opinion was substantially impaired not only by his intoxication but by his increased sensitivity to intoxication, and all of the factors that I mentioned earlier that have made him what he is today, namely his brain damage problem.
Dr. McClain further assessed that Crook suffered from borderline intellectual functioning, "on the border between the low limits of normal and mental retardation." Dr. McClain stated that Crook's prior IQ tests from his childhood revealed scores "as low as 62 or 69 and as high as the low 70s."
The experts' testimony regarding both Crook's intellectual functioning and his brain damage was consistent with the opinion of Dr. Kremper, a clinical and forensic psychologist who examined Crook as part of Crook's social security disability determination in 1994 and who prepared a psychological evaluation of Crook.[2] In his report, Dr. Kremper also concluded that Crook's verbal comprehension and expression and composite intellectual abilities fell within the mild range of mental retardation. After administering the Wechsler Adult Intelligence Scale, Dr. Kremper determined that Crook had a verbal IQ of 62, a performance IQ of 73, and a full scale IQ of 66.[3] Dr. Kremper also found Crook to *73 have "severely limited frustration tolerance" and concluded that due to Crook's "severe cognitive, emotional, and behavioral deficits," with "minor frustration [Crook] was likely to become physically aggressive." Dr. Kremper found that Crook was disabled and "not considered capable of maintaining employment within a competitive work setting due to his severe cognitive, emotional and behavioral deficits. He was unable to tolerate routines, had severe verbal memory difficulties and was not considered able to follow simple instructions on a consistent basis." Dr. Kremper also opined that Cook "experienced auditory and visual hallucinations which appeared to result from extensive substance abuse and head injuries." This report and its conclusions as to Crook's intellectual functioning and behavioral abnormalities also are significant in that the report was not prepared for the defense at trial, but it predated the crime in question by two years.
The State presented no evidence of its own to rebut the expert testimony establishing that Crook suffered from brain damage and that his intellectual abilities were in the range of borderline mental retardation. In fact, during the penalty phase closing argument, the prosecution conceded the issue of brain damage:
What you've heard, I believe, shows that Donny Crooks had a terrible home life from an early age. And I think it's also present on the record that you've heard today that he's got some brain damage.

And now the question is: What weight will you give to that?

. . . .
... And I would ask you to consider for yourselves the impact of some of the issues as it regarded brain damageas Dr. McCraney said, the presence of a bad brainand what is has to do with this case. Which, I believe, if you think about it, there is no perfect world.
(Emphasis supplied.)
In its sentencing order, the trial court found three aggravating circumstances: (1) the capital felony occurred during the commission of a sexual battery; (2) the capital felony was committed for pecuniary gain; and (3) the capital felony was especially heinous, atrocious, or cruel ("HAC"). The trial court, however, found three statutory mitigating circumstances including the two statutory mental mitigators: (1) Crook was twenty years old at the time of the offense (slight weight); (2) the capital felony was committed while Crook was under the influence of an extreme mental or emotional disturbance (moderate weight); and (3) Crook's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired (moderate weight). The trial court also considered and weighed seventeen nonstatutory mitigators, including evidence about Crook's low IQ, learning disabilities, and a terrible and unstable home life.[4] After *74 weighing the aggravating and mitigating circumstances, the trial court sentenced Crook to death.

DISCUSSION
Crook makes three claims in this appeal. First, Crook contends that the trial court erred in failing to find, evaluate, or weigh evidence of Crook's brain damage as a mitigating circumstance. Second, Crook claims that the trial court erred in not finding that Crook's level of intelligence fell within the borderline range of mental retardation. Finally, Crook claims that the death penalty is not proportionate because this is not the most aggravated and least mitigated crime considering the significant statutory and nonstatutory mitigators presented. In arguing that his death sentence is disproportionate, Crook points not only to the brain damage and mental retardation, but also to the mitigating circumstances that Crook was twenty years old at the time of the crime; his childhood was marked by abject poverty, deprivation, and neglect; he suffers from learning disabilities and attention deficit hyperactivity disorder; he dropped out of school in the eighth grade; and he reads on a first-grade level.

MITIGATING CIRCUMSTANCES
This Court has adopted the definition of a mitigating circumstance from the United States Supreme Court, as "any aspect of a defendant's character or record and any of the circumstances of the offense" that reasonably may serve as a basis for imposing a sentence less than death. Campbell v. State, 571 So.2d 415, 419 n. 4 (Fla.1990) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)), receded from in part by Trease v. State, 768 So.2d 1050 (Fla. 2000). "Whenever a reasonable quantum of competent, uncontroverted evidence of mitigation has been presented, the trial court must find that the mitigating circumstance has been proved." Spencer v. State, 645 So.2d 377, 385 (Fla.1994) (citing Nibert v. State, 574 So.2d 1059, 1062 (Fla. 1990)). All "believable and uncontroverted" mitigating evidence contained in the record must be considered and weighed in the sentencing process. Robinson v. State, 684 So.2d 175, 177 (Fla.1996). A trial court, however, may reject proffered mitigation if the record provides competent substantial evidence to support the trial court's decision. See Mahn v. State, 714 So.2d 391, 401 (Fla.1998); Spencer, 645 So.2d at 385; Nibert, 574 So.2d at 1062.

BRAIN DAMAGE
Given these standards, we first address Crook's claim that the trial court erred in failing to find and weigh mitigating evidence that Crook suffered from organic *75 brain damage. Clearly, the existence of brain damage is a significant mitigating factor that trial courts should consider in deciding whether a death sentence is appropriate in a particular case. Cf. Robinson v. State, 761 So.2d 269, 277 (Fla.1999). Thus, we must determine whether the trial court's rejection of mitigating evidence that Crook suffered from brain damage is supported by competent substantial evidence.
In the present case, although the trial court found three statutory mitigators, including two statutory mental mitigators, it is significant that in evaluating and weighing the mitigating evidence the trial court did not find these statutory mental mitigators based upon Crook's uncontroverted organic frontal lobe brain damage. Rather, the trial court found the extreme mental or emotional disturbance and impaired capacity statutory mitigating circumstances based primarily upon Crook's use of alcohol and controlled substances on the date of the homicide, which the court found was entirely voluntary on his part and within his exclusive control.
The trial court apparently rejected the uncontroverted evidence of brain damage in assessing the statutory mitigator because "there was no actual proof of any brain damage." Yet, all three medical experts testified to their objective testing that substantiated the existence of brain damage, specifically to the frontal lobe, which significantly impaired Crook's ability to control his impulses. The experts also explained that Crook's brain damage was exacerbated by the use of both alcohol and drugs at the time of the crime. Not only was their testimony uncontroverted, but it was entirely consistent with the report of Dr. Kremper that predated this murder and found Crook to have "severely limited frustration tolerance" and concluded that due to Crook's "severe cognitive, emotional, and behavioral deficits," with "minor frustration [Crook] was likely to become physically aggressive."
Relying on Robinson, 761 So.2d at 276-77, the State contends that the record shows that the trial court thoroughly assessed all the evidence and reasonably rejected the evidence of brain damage. We find the State's reliance on Robinson to be misplaced. In Robinson, the trial court rejected the equivocal evidence of brain damage because one of the two defense experts testified that the defendant "could have mild brain damage or he could be normal" and that, even if there was brain damage, he was uncertain as to "how or if it would have affected [the defendant's] behavior." Id. at 277. Moreover, despite this testimony, the trial court in Robinson found as a nonstatutory mitigating circumstance that the defendant "had suffered brain damage to his frontal lobe," but gave the mitigator "little weight" because of the insufficient evidence that the brain damage caused the defendant to commit the crime. Id. at 273.
In contrast to Robinson, the trial court in the present case did not find and weigh Crook's brain damage as a valid mitigating circumstance, and rejected its connection to this crime, even though three defense experts, two of whom specialized in brain injuries, presented uncontroverted testimony that Crook suffered from frontal lobe brain damage that established a statutory mental mitigator. Perhaps most significantly, unlike the experts in Robinson, the expert testimony in this case also explained the causes and origins of Crook's frontal lobe brain damage and established that there was a causal link between Crook's brain damage and the homicide.
Accordingly, we hold that the trial court erred in rejecting the uncontroverted evidence of Crook's brain damage. We conclude that based upon the expert testimony, there was "a reasonable quantum of *76 competent, uncontroverted evidence" establishing its existence and its connection to the crime in question. Spencer, 645 So.2d at 385. Certainly, this is not a case where there was little or no evidence presented to support a finding of brain damage, see Shellito v. State, 701 So.2d 837, 844 (Fla.1997), or where the expert testimony pertaining to a mitigating circumstance was equivocal. See Robinson, 761 So.2d at 276-77; see also Franqui v. State, 699 So.2d 1312, 1326 (Fla.1997). As in Spencer, 645 So.2d at 385, where the Court held that the trial judge erred in not finding and weighing uncontroverted mental mitigating circumstances, the expert testimony in this case pertaining to Crook's brain damage was uncontroverted, and the experts reached this conclusion after performing a series of neuropsychological and personality tests, conducting clinical evaluations of Crook, interviewing his mother, reviewing Crook's school and medical records, and examining the evidence in the case. Thus, given the unrefuted expert testimony in this case, we conclude that the trial court erred in failing to find and weigh the evidence of Crook's brain damage in its assessment of statutory mental mitigation.

BORDERLINE MENTAL RETARDATION
Having concluded that the trial court erred in failing to consider and weigh the unrefuted evidence that Crook suffered from brain damage, we next turn to Crook's claim that the trial court failed to consider and weigh evidence that Crook was diagnosed as being borderline mentally retarded.
In considering mental retardation[5] as a mitigating factor for imposing the death penalty, we have explained:
This Court has not established a minimum IQ score below which an execution would violate the Florida Constitution. We have, however, elected to follow the approach suggested by the United States Supreme Court and treat low intelligence as a significant mitigating factor with the lower scores indicating the greater mitigating influence. In the instant case, the trial judge gave "considerable weight" to Thompson's retardation. It is apparent that the jury also gave this evidence considerable weight in view of its 7-5 vote to recommend the death penalty.
Thompson v. State, 648 So.2d 692, 697 (Fla.1994). As in Thompson, the jury's vote to recommend the death penalty in this case was only seven to five. Unlike Thompson, the trial court in this case gave Crook's low intellectual functioning only "slight weight."
In Jones v. State, 705 So.2d 1364, 1366 (Fla.1998), the trial court rejected mitigating *77 evidence that the defendant had organic brain damage and was borderline mentally retarded and imposed a sentence of death. This Court, on appeal, reversed the defendant's death sentence and remanded for the imposition of a life sentence, stating "our review of the record reveals copious unrebutted mitigation," including evidence that the defendant was "borderline" mentally retarded based upon the defendant's IQ of 76, and the fact that the defendant was placed in special education classes, had first-grade reading ability, and had learning disabilities.[6]
In the present case, all of Crook's prior IQ tests from childhood reveal his full-scale IQ to be "as low as 62 or 69 and as high as the low 70s." Significantly, Dr. Kremper, who performed a disability evaluation two years prior to the murder, determined Crook's full scale IQ to be 66 and diagnosed Crook as borderline mentally retarded. This diagnosis was consistent with the findings of Dr. McCraney, who opined that Crook was mildly mentally retarded, and Dr. McClain, who testified that Crook's intellectual abilities were in the borderline mentally retarded range.
Thus, Crook did not simply have a low IQ, as the trial court apparently concluded. As in Jones, Crook had frontal lobe brain damage, Crook's reading ability was on the first-grade level, and Crook had an IQ that fell squarely within the borderline mentally retarded range. In addition, Crook's mental retardation was substantiated before the crime in question. A social security disability evaluation performed two years before the murder not only found Crook to be mentally retarded, but also found Crook disabled and incapable "of maintaining employment within a competitive work setting due to his severe cognitive, emotional and behavioral deficits."
Accordingly, given the uncontroverted expert testimony that Crook was borderline mentally retarded and given the significance that borderline mental retardation may have in considering whether the death sentence is appropriate in a given case, we hold that the trial court erred in rejecting the uncontroverted evidence that Crook was borderline mentally retarded.
Although we do not discount the statutory aggravators, this case highlights the importance of properly evaluating the statutory mental mitigators in light of the uncontroverted evidence of brain damage, mental retardation, and the age of the defendant. We are not certain whether, if the trial court had properly considered the *78 brain damage and borderline mental retardation and the effect of these mental mitigators on the crime in question, the trial court would have found that the aggravation outweighed the mitigation, especially in light of the abundance of nonstatutory mitigation. See Spencer, 645 So.2d at 385; Santos, 591 So.2d at 164.
Accordingly, we affirm Crook's convictions of robbery with a deadly weapon and sexual battery with great force, as well as his concurrent sentences of life imprisonment for these crimes. Moreover, we affirm Crook's conviction for first-degree murder. However, because of the errors discussed above, we vacate the sentence of death and remand the case to the trial court to reconsider and reweigh all available mitigating evidence against the aggravating factors, and to determine the proper penalty in accordance with Florida law.[7]See Walker v. State, 707 So.2d 300, 319 (Fla.1997) (remanding case for "reconsideration" by the trial court of improperly rejected mitigating factors); Jackson v. State, 704 So.2d 500, 507-08 (Fla.1997) (remanding case to trial court "to reweigh the aggravating and mitigating circumstances and resentence Jackson" because trial court improperly rejected unrefuted testimony of three experts regarding extreme mental or emotional disturbance statutory mitigating factor).
It is so ordered.[8]
SHAW, ANSTEAD, PARIENTE, and LEWIS, JJ., concur.
WELLS, C.J., concurs in part and dissents in part with an opinion, in which HARDING and QUINCE, JJ., concur.
WELLS, C.J., concurring in part and dissenting in part.
I concur in the majority's decision to the extent that it affirms Crook's convictions. I respectfully dissent from the majority's decision to vacate the death sentence because I conclude that the majority improperly invades the province of the trial court with respect to the trial court's weighing of the aggravating and mitigating circumstances. I specifically disagree with the majority's discussion relating to Crook's brain damage and intelligence. Based upon my close reading of the trial transcript, I also conclude that the majority overstates the "objective testing" conducted by the mental heath experts.
It is well established that a trial court must consider all evidence of mitigating circumstances when determining whether the death penalty should be imposed. See Eddings v. Oklahoma, 455 U.S. 104, 113-15, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). After considering all evidence, the trial court must determine the existence of aggravating and mitigating circumstances and how much weight should be accorded to each circumstance. See Windom v. State, 656 So.2d 432, 440 (Fla.1995) (sentencing court must weigh mitigating and aggravating circumstances against each other); see also Mansfield v. State, 758 So.2d 636, 646 (Fla.2000); Hildwin v. State, 727 So.2d 193, 198 (Fla.1998); Elledge *79 v. State, 706 So.2d 1340, 1347 (Fla. 1997); Blanco v. State, 706 So.2d 7, 10 (Fla.1997). That is exactly what the trial court correctly did in this case. The weighing of the mitigating circumstances is vested in the sole discretion of the trial court, and this Court does not disturb the assignment of weight absent a clear abuse of discretion. See Blanco, 706 So.2d at 10.
The majority asserts that the trial court erred in rejecting the uncontroverted evidence of Crook's brain damage, that is, the trial court refused to consider brain damage as mitigating evidence. See majority op. at 75. I disagree. The trial court wrote a detailed twenty-page order and in that order considered the evidence presented by the experts with respect to Crook's mental status. In context, I read the trial court's statement "there was no actual proof of any brain damage" to mean there was no radiological evidence in the form of brain scans or EEG studies indicating that there was damage, and that is a correct statement from my careful reading of the transcript. I do not agree with the majority's over-reliance on that statement in the trial court's order as a basis to find that the trial court erred in carrying out its role as the weigher of mitigating evidence, particularly in light of the trial court's findings with respect to mental and psychological evidence of Crook's dysfunctions.
In its consideration of the two statutory mental mitigators, the trial court noted that, while there was no actual proof of brain damage, the statutory mental mitigators existed.[9] The trial court additionally found and weighed as nonstatutory mitigating factors that Crook suffered from other psychological dysfunctions, which the experts testified were symptoms of brain damage. Such dysfunctions included attention deficit disorder with hyperactivity, identifiable learning disabilities, social isolation, language confusion, left-right dominance confusion, visual focus problems, bladder and bowel control problems, fear of abandonment, and sleep disturbance with night terrors.
Obviously, pursuant to the majority's reasoning, the trial court did not err in finding the two statutory mental mitigators. Also clear is the fact that the trial court found and weighed Crook's psychological dysfunctions as nonstatutory mental mitigators which were testified to as symptoms of brain damage. Thus, even if the trial court erred in not finding the existence of brain damage, that error is harmless in light of the trial court's determination that the two statutory mental mitigators existed and the trial court's evaluation of Crook's psychological dysfunctions which the trial court found to exist and accorded weight. Again, what the majority plainly disagrees with the trial court about is the weight given by the trial court to these statutory and nonstatutory mitigators.
Moreover, I do not agree with the majority's construction of Robinson v. State, 761 So.2d 269, 277 (Fla.1999). The majority, relying on Robinson, stated that "[c]learly the existence of brain damage is a significant mitigating factor that trial courts should consider in deciding whether a death sentence is appropriate in a particular case." Majority op. at 75 (emphasis added). Nowhere in Robinson did this Court require brain damage to be considered a "significant" factor. In Robinson, this Court stated "the trial court gave little *80 weight to the existence of brain damage." Id. at 277. This Court found "no abuse of discretion in the trial court's treatment and consideration of the mitigating circumstances." Id. But again, the weight given to a mitigating factor is exclusively within the province of the trial court. See, e.g., Blanco, 706 So.2d at 10.
Further, I disagree with several statements and clear inferences and impressions in the majority's opinion that the tests upon which the experts based their testimony regarding Crook's brain damage were objective.
The majority asserts:
The trial court apparently rejected the uncontroverted evidence of brain damage in assessing the statutory mitigator because "there was no actual proof of any brain damage." Yet, all three medical experts testified to their objective testing that substantiated the existence of brain damage, specifically to the frontal lobe, which substantially impaired Crook's ability to control his impulses.
Majority op. at 75. The problem with the majority's statement that the tests were objective is that the use of the word "objective" creates an impression that the medical experts' opinions were based upon tests such as a brain scans, which have reasonably accepted medical measurements and standards, as differentiated from the experts' subjective conclusions, resting largely upon what Crook told the experts and the experts' personal evaluations. Here, my reading of the testimony of these physicians demonstrates that there was not such a reliance on an abnormal brain scan, but, rather, the expert opinions consisted mostly of conclusions of these experts. This distinction is critical because a trial court may reject expert opinion, as differentiated from factual evidence, even if unrefuted. See Jackson v. State, 704 So.2d 500, 506-07 (Fla.1997) ("[A] trial court may reject expert opinion testimony even if that testimony is unrefuted."); Wuornos v. State, 644 So.2d 1000, 1010 (Fla.1994) (same); Walls v. State, 641 So.2d 381, 390-91 (Fla.1994) (same).
From the record, I see that the experts were two medical doctors and one psychologist. I do not find anywhere in the record what the majority opinion refers to as "their objective testing." Nowhere in the transcript of the testimony does either medical doctor or the psychologist state that any test conducted by any of them was "objective."
The neurologist, Dr. McCraney, testified in answer to the question, "What did you do to perform an examination of Mr. Crook?"
There's three parts to any neurological assessment; the history, the physical and laboratory analyses.
What the history means is talking to the patient trying to understand what the story is. In this case, what his life history is. It also can include a review of records. And I did have some records on him, school records and previous professional evaluations.
The physical examination, in some respects, can be a lot like a physical examination that your family doctor does on you.
For the neurological examination I tend to focus on the nervous system. How the muscles are working. The ability to perceive simple sensations like pain and temperature sensation. Or the ability to perceive more complex sensations like vision and hearing. I test balance and coordination.
Then finally, I spend a significant amount of time testing how the brain is working. Does the patient have memory? Are they processing data correctly? *81 Are they processing data with the right speed?
The final part of the evaluation is testing. In this case I did a test of the brain waves.

(Emphasis added.) In answer to the question of what he found from examining Mr. Crook, Dr. McCraney said:
When I examined him he appeared, basically, healthy. He did not give me the impression of being particularly bright in terms of the simplicity of the vocabulary that he used. And just some of the naive statements he made.
His memory was not all that good. I found that he was oriented. His knowledge of world events was not at all good. Which again kind of goes along with that impression of not having a real high IQ to begin with.
I felt that language functioning was normal. I did find some abnormalities on one of the frontal lobe tests that I did.
Now, I felt that the rest of his nervous system was essentially unremarkable. His spinal cord, nerves and muscles all seemed to be working okay.
Frankly, except for the impression that he had subnormal intelligence, I felt that the rest of his brain was working okay as well.
(Emphasis added.)
As noted, what I would consider to be the only objective test that was part of Dr. McCraney's examination was the brain wave test (I assume that what Dr. McCraney was referring to was an EEG). I can neither find the results of that test in the record nor do I find in Dr. McCraney's testimony any reliance that he put on an abnormal brain wave test. The inference I must draw, then, is that Crook's brain wave test was normal and that the physical part of Dr. McCraney's examination was also normal.
I agree that Dr. McCraney, in various parts of his testimony, said that the frontal lobe of Crook's brain was not working properly. A specific question was asked of Dr. McCraney as to his opinion of Crook's medical condition. That question and Dr. McCraney's answer were:
Q After having given the tests to Donny and after reviewing the records, what opinion did you reach in regard to the medical condition, the neurological condition that Donny had at the time that you saw him?
A When I examined the patient I felt that he was paranoid and impulsive. I got the feeling that he was organic. Meaning that his difficulty arose as a result of brain dysfunction as opposed to character disorder.
I found certain abnormalities on examination, suggesting that his frontal lobe was not working right. I found evidence in the record going back to his early school years suggesting that he was mildly retarded, had a learning disability and suffered from impulsivity from a very early age.
I believe it is also germane to the present review that the entirety of Dr. McCraney's time on Crook's evaluation was one hour, including his review of Crook's past medical records. I also believe the following question and answer from the State's cross-examination are important:
Q Can you tell this jury what information have you received regarding the murder of Betty Spurlock?
A At the time that I wrote my report none, other than what he said. I've had the occasion to speak with his attorney since I made my report, and so I'm familiar with some of it.
Q So, you prepared a report regarding Donny Crook and his ability or inability to control his behaviors, specifically *82 as it regards the First Degree Murder that we are considering here, without any information regarding that event?
A Sort of. The issue upon referral is whether or not he had brain injury, not whether that impacted directly on the charges for which he has been convicted.
Q Okay.
A So, I think any questions on that would have to be posed as a hypothetical, I guess.
The other medical doctor who testified was Dr. McClane, a psychiatrist. From Dr. McClane's testimony I find the following questions and answers pertinent:
Q And did you have the opportunity to perform such an examination on Donny Crook?
A Yes. I've seen him twice.
Q And on your initial evaluation, did you refer Donny to other professionals or other specialists?
A Yes. There were several reasons for that. His situation was a complex one. At times he seemed to be faking things.
Clearly, from the history, he seemed to have some probable neurological brain damage, probable attention deficit disorder, and possibly other neuropsychological abnormalities.
So, I wanted to get both neuropsychological testing and have a neurological evaluation by a neurologist that had an interest, specific interest in the neurology of behavior. So, that's why I asked that Dr. Dolente test him and that Dr. McCraney see him as a neurologist.
I should add that's pretty unusual. I see about 120 persons accused of a crime a year. And probably one to three I refer to a neurologist. That's pretty unusual.
... The pertinence of that is that Donny Crook was an unusual case, an unusual person. Different from the run of the mill. More difficult to understand.
Then, the following question and answer:
Q Given all the data and your examination and your conversations with Donny, what is your overall impression regarding Donny's condition?
A The overall impression is that he has brain damage of a type that's very difficult to specify exactly neurologically and neuropsychologically. There are several factors, I think, that go into the cause here.
After discussion of what Dr. McClane found significant in Mr. Crook's history, he stated his opinion as:
What these have led to is a person who has a, what I think, are a cluster of several diagnoses manifest by a list of symptoms. The diagnoses that I have made include the following:
Number one, borderline intellectual functioning. Borderline means on the border between the low limits of normal and mental retardation.
Second, he has attention deficit hyper-activity disorder. Which all of you have heard of, I'm sure.
With both of these working together have made for very poor school performance, repetition of several grades. Many, many problems in school and in development.
And most importantly, and most pertinently for the current situation with the horrible offense, is that this has resulted in a personality disorder, a rather severe personality disorder with mostly antisocial personality traits but other traits as well.
And one can diagnose this as an antisocial personality disorder. But as I mentioned awhile ago, when you diagnose *83 a personality disorder, you're talking about a cluster of symptoms that hang together without knowing the cause. When you have some pretty good evidence for a cause, and I think we have some here, I think it's more accurate and more plausible to diagnose him as severe personality disorder, secondary to these factors that I have described here, including, perhaps most pertinently, head trauma and substance abuse. With antisocial and other manifestations, including hyperactivity, impulsivity and anger control problems, attention problems. He has difficulty sustaining attention. Poor judgment, low self-esteem, difficulty in interpersonal relationships, manipulativeness. A manipulative sort of life-style where he sort of feels, partly because of low self-esteem, feels that everybody is against him so he is manipulating the world. And this leads to outright malingering at times when he's dealing with mental health professionals or teachers or others.
And finally, this is manifest, in my opinion, if I am correct about the causes, it would render him hypersensitive to the usual negative effects of alcohol and other drugs.
In answer to a direct question about injury, the transcript reflects:
Q Now, you talked about brain injury. Do Donny's symptoms indicate or give you some idea which area of the brain has been injured?
A Yes. We could not document that adequately with physical studies, neurological studies; although, there are some neuropsychological evidence for this. But certainly, when I first saw him, my thought was that he probably had some kind of frontal lobe damage.
(Emphasis added.)
In answer to a specific question about frontal lobe damage, Dr. McClane said:
And with Donny, of course, you have what we think is subtleby subtle, I mean, microscopic and difficult to pick up with normal testssubtle frontal lobe changes which interact with his attention deficit hyperactivity disorder and his long history of substance abuse and of history of, apparent, severe intoxication at the time of his offense.
I think this testimony is appropriately read as meaning that the objective tests were normal. Dr. McClane's conclusions were really his subjective opinion based on Crook's history, which included extensive alcohol and drug abuse. It also should be mentioned that although there is evidence that Crook was involved in an automobile accident, the medical records from that accident reflect no head involvement or injury.
Dr. Dolente, the neuropsychologist, testified that upon his first examination he considered that Crook malingered (faked) throughout the examination. Dr. Dolente did testify as to what he called a "brain injury." His testimony in part was:
In Donny's particular case, the assessment was very interesting, at least from my perspective. I found some indications that were suggestive of brain injury, brain damage, specifically frontal lobe involvement.
It wasn't easy to get to but we got there. The first time I assessed Donny he essentially blew me off.
Dr. Dolente then stated, in answer to the following question:
Q Okay. You said that you gave him a series of tests, and in your diagnosis or your belief, you believe that he is damaged in his frontal lobe?
A Yes, ma'am.
Q Were there certain tests that would lead you to believe that or was it *84 a conglomeration of records, data and the tests?
A Probably primarily the testing led me to believe that Donny could not do very well on a test of verbal learning. In fact, he did very, very poorly. Much more poorly than one might expect, even given his overall intellectual ability, which I found to be very low in average. He came in very, very low on a verbal test. Which loads more heavily on frontal lobe functioning.
He also did very poorly on go, no go tests. Which essentially require the patient to be ... to inhibit their performance.
Go, no go tests have to do, for example, I grab the patient's hand and say when I say red, I want you to squeeze it quickly. When I say green, don't do anything. That's counter to what we know. Green means go.
So, in this case grab the handand these are common bedside tests in neurology they've been around forever and say green, the person does nothing. Red, they're supposed to squeeze, you know, that sort of thing.
People with frontal lobe impairment get that mixed up and have difficulty with that sort of test.
They also have difficulty with coordinated motor movements such as doing this (Demonstrating). It seems pretty silly but these are well documented. They have been around for years. They have been used in neurology for 50 years, et cetera. Very common tests.
So, that, along with the very poor verbal learning test. He made an error on another test which loads heavily on frontal lobe functioning. Led me to believe, and given the history, that there is a degree of organisity in here which I believe is significant and should be considered.
I detail this transcript testimony because, in my view, the transcript testimony contradicts the following statement by the majority:
In contrast to Robinson, the trial court in the present case did not find and weigh Crook's brain damage as a valid mitigating circumstance and rejected its connection to this crime, even though three defense experts, two of whom specialized in brain injuries, presented uncontroverted testimony that Crook suffered from frontal lobe brain damage that established a statutory mental mitigator. Perhaps most significantly, unlike the experts in Robinson, the expert testimony in this case also explained the causes and origins of Crook's frontal lobe brain damage and established that there was a causal link between Crook's brain damage and the homicide.
Majority op. at 75.
The actual testimony of Dr. McCraney, the neurologist, was that he formed his opinion without any information regarding the murder of Betty Spurlock. He did not testify that Crook's brain damage caused him to murder Spurlock, nor did he evaluate Crook with the purpose of making this determination. Dr. Dolente testified that he simply evaluated Crook to determine whether Crook suffered from any form of brain damage.
Based on the foregoing, I find no support for the majority's stated conclusion that the trial judge's weighing of the mitigators was not based on competent, substantial evidence.
HARDING and QUINCE, JJ., concur.
NOTES
[1] The first-degree murder conviction was predicated on alternative theories of premeditated murder and felony-murder with the underlying offenses of robbery and sexual battery. The jury returned a general verdict of guilty of first-degree murder, as well as guilty verdicts on the separate charges of robbery and sexual battery. We find that there is competent substantial evidence to support the jury's verdict in this case.
[2] Dr. Kremper did not testify during trial. By agreement between Crook and the State, Crook's medical records and school records were submitted to the trial court for its review. Dr. Kremper's psychological evaluation of Crook was a part of those records.
[3] The sentencing order reflects that the trial court also considered the psychological evaluations of Crook performed by Dr. Haskovec and Dr. Mercer. Dr. Haskovec examined Crook when Crook was five years old and found that Crook had an IQ of 76, which according to Dr. Haskovec, placed Crook "within the Borderline range of functioning." Dr. Mercer examined Crook in 1995 when Crook was nineteen years old. According to Dr. Mercer's report, Crook had a full scale IQ of 75, which "plac[ed] his current level of overall intellectual functioning in the Borderline Range."
[4] The trial court considered the following nonstatutory mitigating factors: (1) Crook's love for his family (slight weight); (2) Crook's IQ is within the low-average range of intelligence (slight weight); (3) Crook's learning disabilities and impaired educational experiences (slight weight); (4) Crook's childhood environmental conditions and the fact that his parents were "abysmal failures as parents" (moderate weight); (5) Crook's life was spent in abject poverty (slight weight); (6) Crook's home life was terrible and unstable (moderate weight); (7) the absence of a role model (moderate weight); (8) Crook suffered from various psychological and social dysfunctions, excluding brain damage (slight weight); (9) Crook's education opportunities were frustrated before he even had a chance to succeed (slight weight); (10) Crook's long history of substance abuse (slight weight); (11) traumas involving the death of his father and uncle at a young age (slight weight); (12) Crook was "a virtual emotional cripple" because he was frequently left in the care of his older brothers, both of whom had their own social and physical difficulties, while his mother prostituted herself (moderate weight); (13) Crook's criminal history reflects petty criminal activity and is devoid of any significant violent behavior (slight weight); (14) Crook did not flee the county or the state after the offense was committed (slight weight); (15) Crook did not resist authorities as they took hair and blood samples, photographed Crook's body, took shoe measurements, and questioned him about the homicide (slight weight); (16) Crook's taped confessions reflected true remorse for his actions (slight weight); and (17) Crook displayed good courtroom behavior, despite serious emotional and impulse control problems (slight weight).
[5] Society's understanding of mental retardation continues to evolve. See generally Lyn Entzeroth, Putting the Mentally Retarded Criminal Defendant to Death: Charting the Development of a National Consensus to Exempt the Mentally Retarded from the Death Penalty, 52 Ala. L.Rev. 911 (2001). See also John Blume & David Bruck, Sentencing the Mentally Retarded to Death: An Eighth Amendment Analysis, 41 Ark. L.Rev. 725 (1988); David A. Davis, Executing the Mentally Retarded: The Status of Florida Law, Fla. B.J., Feb. 1991, at 12. Mental retardation is "a severe and permanent mental impairment that affects almost every aspect of a mentally retarded person's life." Blume & Bruck, supra, at 734. A person who is mentally retarded is not just slower or "not quite as smart as the average person." Id. Rather, it is generally recognized that mental retardation is a permanent learning disability that manifests itself in several ways, including poor communication skills, impaired impulse control, overrating one's own skills, short memory, short attention span, and immature or incomplete concepts of blameworthiness and causation. See Blume & Bruck, supra, at 732-34; Davis, supra, at 13.
[6] See also Cooper v. State, 739 So.2d 82, 88-89 (Fla.1999) (vacating defendant's death sentence and imposing a life sentence where the mitigating evidence included evidence that the defendant suffered from brain damage, mental retardation, and had an abusive childhood; expert witnesses testified that a person's IQ of 82 is "low average," while an IQ of 77 is in the borderline mentally retarded range); Downs v. State, 574 So.2d 1095, 1099 (Fla.1991) (vacating defendant's life sentence and imposing a life sentence based upon "ample mitigating evidence," including defendant's IQ of 71, a mental age of 13, and borderline mental retardation); Morris v. State, 557 So.2d 27, 30 (Fla.1990) (vacating death sentence and imposing a life sentence where the mitigating evidence included circumstances that the defendant was "borderline mentally retarded with an IQ of approximately seventy-five"); Brown v. State, 526 So.2d 903, 908 (Fla.1988) (vacating defendant's death sentence and imposing a life sentence where the mitigating evidence included circumstances that the defendant had an IQ of 70-75, which was "classified as borderline defective or just above the level for mild mental retardation," and emotionally handicapped); Thompson v. State, 456 So.2d 444, 447 (Fla.1984) (vacating death sentence and imposing a life sentence where there was "uncontradicted testimony" that the defendant had "an IQ between 50 and 70, which placed him clinically in the mildly retarded range").
[7] We note that the Legislature recently passed a bill, which the Governor signed into law, that sets up a procedure to determine if defendants charged with capital felonies are mentally retarded, and to prohibit mentally retarded defendants from being executed. See ch.2001-202, Laws of Florida (2001) (codified at § 921.137, Fla. Stat. (2001)). The law by its express terms does not apply to defendants sentenced to death before the effective date of the statute. See id. However, the applicability of this new legislation and its effect, if any, on Crook's case are not before us.
[8] Because we are remanding this case to the trial court, we do not reach the issue pertaining to the proportionality of Crook's death sentence in this case.
[9] The statutory mental mitigators were: (1) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance; and (2) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.