574 So.2d 1059 (1990)
Billy Ray NIBERT, Appellant,
v.
STATE of Florida, Appellee.
No. 71980.
Supreme Court of Florida.
July 26, 1990.
Rehearing Denied December 13, 1990 and March 6, 1991.
*1060 James Marion Moorman, Public Defender, and Douglas S. Connor, Asst. Public Defender, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen., and Katherine V. Blanco, Asst. Atty. Gen., Tampa, for appellee.
BARKETT, Justice.
Billy Ray Nibert was tried and convicted of first-degree murder and sentenced to death. This Court affirmed the conviction but vacated the sentence and remanded for resentencing. Nibert v. State, 508 So.2d 1 (Fla. 1987). On remand, the trial court again sentenced Nibert to death. We vacate the reimposition of the death sentence and remand for imposition of a sentence of life imprisonment.[1]
Eugene Snavely ("Snavely"), 57, was a frequently intoxicated alcoholic and one of Nibert's drinking buddies. Snavely lived across the street from his brother, James, in Hillsborough County, Florida. James testified that on November 16, 1984, he looked through his window and saw an individual approach Snavely and enter Snavely's home with him. Forty-five minutes later, Snavely appeared at James's door, holding a knife and bleeding profusely. Medical testimony showed that Snavely had been stabbed seventeen times. Three of the stab wounds were serious enough to be lethal, and some of the wounds were defensive in nature. Snavely may have been conscious throughout the stabbing, but he would have lost consciousness within minutes.
Jack Andruskiewiecz, an acquaintance of Nibert, testified that Nibert came to his hotel room on the evening of the murder. Nibert was in a state of shock and was covered with blood. He was "white," "hyperventilating," "gasping for breath," had "dry heaves," and was "freaked out." Andruskiewiecz said that Nibert initially explained that he had been involved in a bar fight. Later, he said it was a street fight. Still later, after watching a late night news story on the stabbing, Nibert admitted to Andruskiewiecz that he had stabbed Snavely. Andruskiewiecz also testified that Nibert told him that he made Snavely get down on his knees, but Andruskiewiecz did not tell that to the police because he only remembered that detail on the day of the trial.
Over Nibert's objection, Andruskiewiecz was allowed to testify that a few days before the murder, Nibert had indicated his intent to rob Snavely. However, police found no evidence of robbery. There was no evidence presented that Nibert went to Snavely's house to kill. The state concedes that the murder weapon probably belonged to Snavely, not Nibert.[2]
Evidence found at the scene included six empty, tall beer cans which still had condensation on the outside, indicating that they had been recently emptied. Snavely's blood indicated an alcohol content equivalent to half the level necessary to raise a presumption of driving while intoxicated.
Nibert's former employers testified that Nibert worked for them for two years, and that he was a trustworthy employee. He was fired several times for missing work after getting drunk on the weekends, but they always rehired him because he was a good worker and never had a problem on the job. Nibert's estranged wife testified that Nibert had a serious problem with alcohol, including binges that lasted for days. Those problems destroyed their marriage. "When he is sober he is the nicest person that could ever be," she said. "It's just that drinking does things to him."
Nibert's sisters testified that he was raised by an alcoholic mother and a succession of stepfathers, and that his mother forced him to start drinking alcohol at the *1061 age of eleven or twelve. His mother frequently brought home men from bars and had sex in the living room in front of the children. She asked Nibert to steal money from those men, but he refused. She beat the children with a belt or a switch nearly every day. Both sisters later required psychiatric treatment because of their childhood problems with their mother.
Dr. Sidney Merin, a clinical psychologist and neuropsychologist, said he administered tests to Nibert before his first trial in March 1985, and retested him two and one-half years later. The results revealed a substantial improvement across the board. He attributed the first set of results to the effect that alcohol had on Nibert's brain, and the improvement was due to the drying out and rehabilitation of the brain.
Dr. Merin said that Nibert told him that on the morning of the murder, Nibert sold blood to a blood bank and bought whiskey, which he drank. Then he drank more at a tavern that afternoon, and drank beer with Snavely at Snavely's house. Dry heaves or vomiting are not uncommon among individuals who had drunk alcohol and had been in an intense state of distress, he said. Nibert was aware of what he had done and he was overcome by revulsion. Dr. Merin also said Nibert's mother and father were alcoholics, and that Nibert had been mentally and physically abused as a child. Drinking was encouraged from the age of twelve.
Dr. Merin concluded that Nibert committed the murder under the influence of extreme mental or emotional disturbance, and that his capacity to control his behavior was substantially impaired, although he could appreciate the criminality of his conduct. Some test results were consistent with a person of a below-average IQ. Evidence also showed that Nibert felt "a great deal" of remorse and has a "good potential for rehabilitation." A structured environment, such as a prison, is helpful for rehabilitation, Dr. Merin said, and the improvement in Nibert's test results indicates that positive changes already have taken place. There was no evidence that Nibert had a prior record of violent criminal behavior.
The state presented no evidence to challenge any of the mitigating evidence.
The jury voted seven to five to recommend the death sentence. The trial court imposed the death sentence upon finding one aggravating circumstance: that the murder was committed in an especially heinous, atrocious, or cruel manner.[3] The trial court found no statutory mitigating circumstances, expressly rejecting the claims that Nibert lacked the capacity to conform his conduct to the requirements of the law,[4] and that Nibert was under the influence of extreme emotional or mental disturbance.[5] As to nonstatutory mitigation, the trial court found "possible" mitigation in that Nibert "had an abused childhood; however, at the time of the murder the Defendant was twenty-seven (27) years old and had not lived with his mother since he was eighteen (18)."
Initially, we find that the trial court did not err in concluding that the murder was heinous, atrocious, or cruel. The Court reached the same conclusion in Nibert's first appeal on the same aggravating evidence, reasoning that "[t]he victim was stabbed seventeen times. There was testimony that some of his wounds were defensive wounds and that the victim remained conscious throughout the stabbing." Nibert, 508 So.2d at 4.
However, we agree with Nibert's claim that the trial court should have found additional mitigating circumstances, and, in light of all the mitigating evidence, the sentence of death was disproportional when compared with other capital cases where this Court has vacated the death sentence and imposed life imprisonment.
A mitigating circumstance must be "reasonably established by the greater weight of the evidence." Campbell v. State, 571 So.2d 415 (Fla. 1990); see also Fla. Std. Jury Instr. (Crim) at 81; Rogers v. State, 511 So.2d 526, 534 (Fla. 1987), cert. *1062 denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). Where uncontroverted evidence of a mitigating circumstance has been presented, a reasonable quantum of competent proof is required before the circumstance can be said to have been established. See Campbell. Thus, when a reasonable quantum of competent, uncontroverted evidence of a mitigating circumstance is presented, the trial court must find that the mitigating circumstance has been proved. A trial court may reject a defendant's claim that a mitigating circumstance has been proved, however, provided that the record contains "competent substantial evidence to support the trial court's rejection of these mitigating circumstances." Kight v. State, 512 So.2d 922, 933 (Fla. 1987), cert. denied, 485 U.S. 929, 108 S.Ct. 1100, 99 L.Ed.2d 262 (1988); Cook v. State, 542 So.2d 964, 971 (Fla. 1989) (trial court's discretion will not be disturbed if the record contains "positive evidence" to refute evidence of the mitigating circumstance); see also Pardo v. State, 563 So.2d 77, 80 (Fla. 1990) (this Court is not bound to accept a trial court's findings concerning mitigation if the findings are based on a misconstruction of undisputed facts or a misapprehension of law).
Nibert presented a large quantum of uncontroverted mitigating evidence. First, Nibert produced uncontroverted evidence that he had been physically and psychologically abused in his youth for many years. The trial court found this to be "possible" mitigation, but dismissed the mitigation by pointing out that "at the time of the murder the Defendant was twenty-seven (27) years old and had not lived with his mother since he was eighteen (18)." We find that analysis inapposite. The fact that a defendant had suffered through more than a decade of psychological and physical abuse during the defendant's formative childhood and adolescent years is in no way diminished by the fact that the abuse finally came to an end. To accept that analysis would mean that a defendant's history as a victim of child abuse would never be accepted as a mitigating circumstance, despite well-settled law to the contrary. Nibert reasonably proved this nonstatutory mitigating circumstance, and there is no competent, substantial evidence to support the trial court's refusal to consider it. See, e.g., Brown v. State, 526 So.2d 903, 908 (Fla.) (defendant's disadvantaged childhood, abusive parents, and lack of education and training, constitute valid mitigation and must be considered), cert. denied, 488 U.S. 944, 109 S.Ct. 371, 102 L.Ed.2d 361 (1988).
Second, evidence showed that Nibert has felt "a great deal" of remorse and has a "good potential for rehabilitation," especially in the kind of structured prison environment where his mental condition has improved markedly since the crime occurred. We have held the potential for rehabilitation to be a valid mitigating circumstance. Brown, 526 So.2d at 908 ("The potential for rehabilitation constitutes a valid mitigating factor. Francis v. Dugger, 514 So.2d 1097, 1098 (Fla. 1987); Valle v. State, 502 So.2d 1225, 1226 (Fla. 1987)."); see also Songer v. State, 544 So.2d 1010, 1011-12 (Fla. 1989) (mitigation found in, among other things, unrebutted evidence that defendant's reasoning abilities were substantially impaired by addiction to hard drugs; defendant was remorseful; defendant experienced positive change and selfimprovement while in prison; and defendant was adaptable to structured prison life); cf. Carter v. State, 560 So.2d 1166, 1169 (Fla. 1990) (defendant's amenability to rehabilitation considered a factor in reversing jury override). The trial court erred by not finding and weighing this uncontroverted mitigating circumstance.
Finally, Dr. Merin, an expert in the field of brain dysfunction, testified without equivocation that in his opinion, Nibert committed the murder under the influence of extreme mental or emotional disturbance, and that his capacity to control his behavior was substantially impaired. Dr. Merin supported those conclusions with a battery of psychological examinations conducted over a two-and-one-half-year period; with interviews of Nibert and his family; and with Dr. Merin's examination of the record evidence in this case. Moreover, there was proof that Nibert has suffered *1063 from chronic and extreme alcohol abuse since his preteen years; that he was a nice person when sober but a completely different person when drunk; that he had been drinking heavily on the day of the murder; and that, consistent with the physical evidence at the scene, he was drinking when he attacked the victim. We have held that such evidence is relevant and supportive of the mitigating circumstances of extreme mental or emotional disturbance and substantial impairment of a defendant's capacity to control his behavior. See Ross v. State, 474 So.2d 1170, 1174 (Fla. 1985) (trial court erred in not considering in mitigation, among other things, that defendant had drinking problems and had been drinking when he attacked the victim); cf. Carter, 560 So.2d at 1168-69 (jury override vacated upon considering evidence of defendant's extreme emotional disturbance, impaired ability to appreciate criminality of his conduct, amenability to rehabilitation, and defendant "suffered the ill effects of chronic alcohol and drug abuse at the time of his offense").
In this instance, there was no competent, substantial evidence in the record to refute the mitigating evidence. Rather, the record shows that Nibert was a childabused, chronic alcoholic who lacked substantial control over his behavior when he drank, and that he had been drinking heavily on the day of Snavely's murder.
We conclude that the trial court failed to properly weigh a substantial number of statutory and nonstatutory mitigating circumstances. There is no need to have the trial court reweigh the aggravating and mitigating circumstances because on this record we find that the death penalty was disproportional punishment when compared to other cases decided by this Court. As we said recently in Songer, this Court has affirmed death sentences supported by one aggravating circumstance only in cases involving "either nothing or very little in mitigation." Songer, 544 So.2d at 1011. This case involves substantial mitigation, and we have held that substantial mitigation may make the death penalty inappropriate even when the aggravating circumstance of heinous, atrocious, or cruel has been proved. Smalley v. State, 546 So.2d 720 (Fla. 1989) (substantial mitigation made death penalty disproportional despite proof of heinous, atrocious, or cruel, in murder of twenty-eight-month-old girl who died after defendant struck the child repeatedly, dunked her head in water, and banged her head on the floor); Blakely v. State, 561 So.2d 560 (Fla. 1990) (death sentence was disproportional in domestic dispute despite finding two aggravating circumstances: heinous, atrocious, or cruel; and cold, calculated, and premeditated); cf. Lloyd v. State, 524 So.2d 396, 403 (Fla. 1988) (death sentence was disproportional where the aggravating circumstance of murder committed in the course of an attempted robbery was weighed against no significant history of prior criminal activities); Rembert v. State, 445 So.2d 337 (Fla. 1984) (death was disproportional punishment for murder committed in course of a robbery where court found no mitigating circumstances).
There is no need to address other issues Nibert raises on appeal. We vacate the reimposition of the death sentence and remand for imposition of a sentence of life imprisonment.
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD, EHRLICH, GRIMES and KOGAN, JJ., concur.
NOTES
[1] We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution.
[2] In Nibert's first appeal, we said there was no evidence that Snavely had been robbed, and the evidence did not support the trial court's finding that the murder had been committed in a cold, calculated, and premeditated manner. Nibert v. State, 508 So.2d 1, 4 (Fla. 1987).
[3] § 921.141(5)(h), Fla. Stat. (1983).
[4] Id. § 921.141(6)(f).
[5] Id. § 921.141(6)(b).