863 So.2d 169 (2003)
Fred ANDERSON, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. SC01-336.
Supreme Court of Florida.
September 25, 2003.
*173 James B. Gibson, Public Defender, James R. Wulchak, Chief, Appellate Division, Assistant Public Defender, and George D.E. Burden, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Kenneth S. Nunnelley, Assistant Attorney General, Daytona Beach, FL, for Appellee.
PER CURIAM.
We have for review a judgment of conviction of first-degree murder and sentence of the trial court imposing the death *174 penalty upon Fred Anderson, Jr. We have jurisdiction pursuant to article V, section 3(b)(1), of the Florida Constitution. For the reasons expressed below, we affirm Anderson's convictions and sentences for grand theft of a firearm, robbery with a firearm, attempted first-degree murder, and first-degree murder.

FACTS
On March 20, 1999, appellant Fred Anderson, Jr. robbed the United Southern Bank (USB) in Mount Dora, Florida, and shot two tellers, Marisha Scott and Heather Young. Young was killed, but Scott survived.
At trial it was revealed that Anderson was on community control for a conviction of grand theft. He was ordered to pay restitution in excess of $4,000, but he paid less than $100. On March 15, 1999, Anderson was found to have violated his community control and was ordered to spend one year at a probation center beginning March 19. To obtain the funds to pay the restitution, Anderson decided to rob the Mount Dora USB, and, on March 18, 1999, he visited a member of his church at the USB where she worked as a part-time teller. Anderson also stole a loaded.22 caliber six-shot revolver from a neighbor's storage building. The gun fired heavier ammunition than a normal .22 caliber revolver and was a single action revolver, which meant that the hammer had to be pulled back and cocked each time the gun was fired.
On the morning of March 19, Anderson went to the USB under the pretense that he was a student writing a paper on banking and finance. He spoke with Scott and met with the bank manager, Allen Seabrook. Anderson took particular note of the bank's security VCR, which was kept in Seabrook's office. His plan was to deposit the robbery money into a new bank account at a second bank. After visiting the second bank, Anderson telephoned his supervisor and told her he had the money to pay off the restitution.
On March 20, a Saturday, Anderson obtained a second .22 caliber revolver from his mother's house, and then went to the USB with orange juice and doughnuts under the ruse that he wanted to thank the employees for their help. USB was scheduled to close at noon and Young and Scott were the only people working. Shortly before noon when no customers were present, Anderson told Young and Scott that he was going to his car to get his business card. Anderson returned with the two revolvers and ordered Young and Scott into the bank vault where he ordered them to fill a trash liner with money. Anderson then shot the two tellers. Scott was left paralyzed but was able to testify at trial. She testified that Anderson asked which one of them wanted to die first. Scott said she begged not to be shot.[1]
During the robbery, Sherry Howard entered the bank with her children and saw Anderson near the vault. She also heard Scott saying, "Please don't" or "please no." Howard heard two or three gunshots and ran outside to call the police. The first police officer to arrive saw Anderson ripping an electrical cord and VCR equipment from the wall. Anderson was holding a trash can, which contained the smaller revolver and cash in excess of $70,000. The officer told Anderson to "drop the stuff." Anderson complied and was handcuffed.[2] Paramedics arrived and *175 began working on the two victims. Young died in transit to the hospital.
In addition to being caught while the crime was in progress, Anderson's hands tested positive for gunshot residue, and blood recovered from Anderson's clothing was consistent with Scott's DNA. Additionally, a Florida Department of Law Enforcement (FDLE) firearms analyst examined the guns seized at the scene.[3] She compared bullets test fired from the guns with seven bullets fired during the crime, some of which were found in the vault and others of which were recovered from Young's body during an autopsy. She concluded that four larger bullets displayed the same poor rifling characteristics as the test fires from the long caliber revolver, but she was not able to positively match them with that gun. However, she did positively match three smaller bullets with the second revolver.
The forensic pathologist who performed the autopsy on Heather Young testified that Young had a total of seven gunshot wounds. She said that all of Young's wounds could have been fatal, with the possible exception of a wound that had entered Young's chin and exited near her eye. One of the wounds had a pattern of gunpowder "tattooing" around it, which indicated that it had been fired at close range. She also testified that there were two injuries on Young's head that were consistent with blunt force trauma caused by some sort of flat surface. At trial, the pathologist examined a picture of Scott and noted that Scott had the same type of blunt trauma injury on her forehead.[4]
During the defense's case-in-chief, Anderson took the stand. Anderson admitted the robbery and testified to his bleak financial condition. Anderson also testified that he lived with his mother, who was disabled, retired, and a cancer survivor. Anderson admitted taking both guns and shooting the tellers, although he stated that he could only remember firing three shots. He also denied that he asked the tellers which one of them wanted to die first.
The jury convicted Anderson of grand theft for stealing the revolver, armed robbery, attempted first-degree murder, and first-degree murder. During the penalty phase, the State introduced the testimony of Young's brother and of her long time boyfriend. The defense offered the testimony of a number of people, including Anderson's mother, friends, members of Anderson's church, and former employers, all of whom testified that they had known him as a person of good character. The jury unanimously voted in favor of a death sentence recommendation and the trial court sentenced Anderson to death. The trial court found four aggravating factors[5] *176 and ten nonstatutory mitigating factors.[6]

ANALYSIS
On appeal, Anderson raises nine issues.[7] Although Anderson does not raise the issue of sufficiency of the evidence on appeal, we have independently reviewed the evidence in this case and conclude that there is sufficient evidence supporting the convictions in this case. See Sexton v. State, 775 So.2d 923, 933-34 (Fla.2000); Brown v. State, 721 So.2d 274, 277 (Fla. 1998); see also § 921.141(4), Fla. Stat. (2002); Fla. R.App. P. 9.140(h). We have referred to that evidence in some detail above.

AGGRAVATING CIRCUMSTANCES
Initially, Anderson claims that the trial court erroneously found the aggravating circumstances of CCP and pecuniary gain. On appellate review, a trial court's ruling on an aggravating circumstance will be sustained as long as the court applied the appropriate rule of law and its ruling is supported by competent, substantial evidence in the record. See Willacy v. State, 696 So.2d 693, 695 (Fla. 1997).
In order to establish the CCP aggravating factor:
[T]he jury must determine that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); and that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); and that the defendant exhibited heightened premeditation (premeditated); and that the defendant had *177 no pretense of moral or legal justification.
Jackson v. State, 648 So.2d 85, 89 (Fla. 1994) (citations omitted). Anderson argued in his brief and at oral argument that, although he had carefully planned the robbery of the USB, the shootings were not planned and were the result of him panicking during the robbery. It is true that a plan to kill cannot be inferred solely from a plan to commit another felony such as robbery. See Farina v. State, 801 So.2d 44, 54 (Fla.2001); Geralds v. State, 601 So.2d 1157, 1163 (Fla.1992). However, a prearranged plan to kill in order to prove CCP can be indicated by facts such as procurement of a weapon, lack of resistance or provocation, and the appearance of carrying out the murder as a matter of course. See Farina, 801 So.2d at 54; Bell v. State, 699 So.2d 674, 677 (Fla.1997); Swafford v. State, 533 So.2d 270, 277 (Fla. 1988).
We conclude that the trial court's finding of CCP is supported by competent, substantial evidence. The following evidence considered together provides support for the trial court's finding: (1) Anderson procured two lethal weapons before the crime; (2) Anderson contrived a complex scheme for the robbery and visited the USB on two separate occasions before the robbery; (3) on one visit Anderson spent a long amount of time in the bank and carefully viewed the bank's physical layout along with its security system; (4) on the day of the crime, Anderson went to the bank with orange juice and doughnuts as part of his scheme of deceit; (5) Anderson never attempted to disguise himself; (6) Anderson waited until the bank was scheduled to close to act; (7) Anderson intentionally left the bank briefly and procured two loaded, .22 caliber, six-shot revolvers; (8) Young and Scott never resisted; (9) after securing the money Anderson asked the tellers which one of them wanted to die first, and before the shooting began Scott begged Anderson not to shoot;[8] (10) despite the lack of resistance, Anderson fired ten shots from the two guns at point blank range, with nine of these shots hitting the victims; (11) one of the guns used required Anderson to pull the hammer back, cock the weapon and squeeze the trigger six times; (12) at some point during the shooting Anderson switched weapons and continued firing; and (13) after shooting both of the tellers, Anderson went to the bank manager's office to get the security video from the VCR. Especially when considered together, we find these circumstances constitute competent, substantial evidence supporting the trial court's finding that the murder was cold, calculated and premeditated without any pretense of moral or legal justification.[9]
*178 Next, Anderson argues that the trial court erred in finding the pecuniary gain aggravating circumstance.[10] In order to establish that a murder was committed for the purpose of pecuniary gain, the State must prove beyond a reasonable doubt that the murder was motivated, at least in part, by a desire to obtain money, property, or other financial gain. See Finney v. State, 660 So.2d 674, 680 (Fla.1995); Clark v. State, 609 So.2d 513, 515 (Fla.1992); Peek v. State, 395 So.2d 492, 499 (Fla. 1980). The fact that the murder occurred during the robbery of the bank intuitively indicates that it was motivated, at least in part, by Anderson's desire to obtain money, and, therefore, this aggravating circumstance is supported by competent, substantial evidence.

MITIGATING CIRCUMSTANCES
Next, Anderson claims that the trial court erred in failing to consider available mitigating evidence and giving little weight to two mitigating circumstances: Anderson's employment history and his "potential for rehabilitation" and "skills to be productive in prison."
At the outset, we would note that Anderson is incorrect in claiming that the trial court failed to consider this mitigation. The trial court considered and found the mitigation but assigned it little weight. A trial court "must find as a mitigating circumstance each proposed factor that is mitigating in nature and has been reasonably established by the greater weight of the evidence." Campbell v. State, 571 So.2d 415, 419 (Fla.1990) (footnote omitted). However, a trial court may reject a claim that a mitigating circumstance has been proven provided that the record contains competent, substantial evidence to support the rejection. See Mansfield v. State, 758 So.2d 636, 646 (Fla.2000); Ferrell v. State, 653 So.2d 367, 371 (Fla. 1995). Once a particular mitigating circumstance has been established, the trial court determines the weight it should be given. Campbell, 571 So.2d at 420. The trial court's conclusions as to the weight of mitigating circumstances will be sustained by this Court if the conclusions are supported by sufficient evidence. Id.
In the instant case, the trial court considered Anderson's employment history and found it to be a mitigating circumstance but assigned it little weight. A defendant's employment history can be used as mitigating evidence. See, e.g., Darling v. State, 808 So.2d 145, 164 (Fla. 2002); Rose v. State, 787 So.2d 786, 804 (Fla.2001); Stevens v. State, 552 So.2d 1082, 1086 (Fla.1989). However, determining the weight to be given to a defendant's employment history is up to the discretion of the sentencing court. See Campbell, 571 So.2d at 420. Although some evidence was introduced that Anderson had on occasion been a reliable and trusted employee, the trial court noted that his employment history could appropriately be described as sporadic. Under these circumstances, we conclude that the trial court did not abuse *179 its discretion in assigning Anderson's employment history little weight.
Anderson also claims that the trial court erred in assigning little weight to his ability to be rehabilitated and to function well in prison. In arguing that the trial court erred, Anderson relies on our opinion in Nibert v. State, 574 So.2d 1059 (Fla.1990). In Nibert, we found that the trial court erred when it found the defendant's physical and psychological abuse was "possible" mitigation, but did not consider it in sentencing because the abuse had taken place when the defendant was a child. See id. at 1062. We concluded that the trial court had improperly rejected the mitigation, specifically noting that "[t]he fact that a defendant had suffered through more than a decade of psychological and physical abuse during the defendant's formative childhood and adolescent years is in no way diminished by the fact that the abuse finally came to an end." Id. Furthermore, unlike Nibert, where the trial court refused to consider the defendant's physical and psychological abuse, the trial court in the instant case did consider Anderson's proposed mitigation in sentencing, but upon consideration determined it was of little weight. We conclude that the trial court did not abuse its discretion in assigning this mitigation little weight.

EXPERT WITNESS TESTIMONY
Anderson argues that the trial court erred in admitting the testimony of Farley "Jake" Caudill, a blood stain pattern analyst. Caudill testified as to blood stain patterns inside the vault.[11] Anderson's primary argument is that Caudill was not qualified to express an expert opinion; however, he also argues that the testimony was of dubious probative value, completely speculative, and highly inflammatory. Although Caudill's qualifications and opinion are subject to question, we nevertheless believe that the trial court did not abuse its discretion in allowing this expert testimony.
It is well settled that the determination of a witness's qualifications to express an expert opinion is peculiarly within the discretion of the trial judge, whose decision will not be reversed absent a clear showing of error.[12]See Provenzano v. State, 750 So.2d 597, 602 (Fla.1999); Brennan v. State, 754 So.2d 1, 4 (Fla. 1999); Geralds v. State, 674 So.2d 96, 100 (Fla.1996); Terry v. State, 668 So.2d 954, 960 (Fla.1996); Ramirez v. State, 542 So.2d 352, 355 (Fla.1989).
Caudill's qualifications were similar to those of the blood spatter expert in Cheshire *180 v. State, 568 So.2d 908, 913 (Fla. 1990).[13] In Cheshire, we stated:
Cheshire alleges that the trial court improperly qualified a man named Allen Miller as an expert in blood-spatter evidence. It appears Miller's qualifications consisted of a single forty-hour course, three prior qualifications as an expert and his own field experience. While we agree that these qualifications are open to reasonable question, we nevertheless believe that the trial court did not abuse its discretion in allowing this expert testimony. Any deficiencies in an expert's qualifications, experience and testimony may be aired on cross-examination, provided there is some reasonable basis to qualify the expert. We believe such a basis existed on this record.
Id. In the instant case, although we would note that Caudill's qualifications are also "open to reasonable question," we conclude that the trial court did not abuse its discretion in allowing Caudill to testify.
To the extent Anderson argues that Caudill's testimony was of dubious probative value, completely speculative, and highly inflammatory, he relies on the four evidentiary requirements described in Glendening v. State, 536 So.2d 212, 220 (Fla.1988), for admitting an expert opinion: "(1) the opinion evidence must help the trier of fact; (2) the witness must be qualified as an expert; (3) the opinion must be capable of being applied to evidence at trial; and (4) the probative value of the opinion must not be substantially outweighed by the danger of unfair prejudice." Anderson argues that Caudill's testimony fails each of these requirements.
Notably, Anderson's objection at trial went primarily to Caudill's qualifications. After the trial court rejected Anderson's arguments regarding Caudill's qualifications, Anderson moved to strike Caudill's testimony on the following grounds:
[I]t is [Caudill's] opinion that is based on an assumption rather than a factual predicate, that being that his opinion is based upon the assumption that the blood stains originated from the same source, which has not been factually established. And he is also basing his opinion upon the assumption that the substance on the counter is of a cosmetic nature and that also has not been established as a factual matter.[14]
Unlike Anderson's current argument, which claims that Caudill's testimony "was of dubious probative value, completely speculative, and highly inflammatory," Anderson's objection at trial appears to have been based on whether the predicate facts had been established to allow Caudill to form his opinion, i.e., whether he had tested the blood to see if it came from the *181 same individual or whether he had tested the chemical nature of a material found on one of the vault's counter tops that appeared to be cosmetics. Therefore, Anderson's current argument is not preserved for review. See Occhicone v. State, 570 So.2d 902, 905-06 (Fla.1990) (stating that claim was not preserved for review where defense failed to object on specific grounds advanced on appeal); Farinas v. State, 569 So.2d 425, 429 (Fla.1990) (stating that "[a]bsent fundamental error, an issue will not be considered for the first time on appeal"); Bertolotti v. Dugger, 514 So.2d 1095, 1096 (Fla.1987) (stating that "[i]n order to preserve an issue for appellate review, the specific legal argument or ground upon which it is based must be presented to the trial court").
Even if Anderson's argument had been preserved, we would conclude that the trial court did not abuse its discretion in allowing Caudill to testify. Caudill's testimony was relevant with regard to the State's theory on blunt force trauma.[15] Moreover, Anderson's counsel rigorously cross-examined Caudill, and this cross-examination would have let the trier of fact assess the weight and credibility that should be attached to Caudill's opinion.

MOTION TO SUPPRESS
Anderson argues that the trial court erred when it denied his motion to suppress statements he made to the police on March 20, 1999. We disagree and find that the trial court properly denied Anderson's motion. As an initial matter, Anderson's argument on this issue is somewhat enigmatic because he does not address the limited extent to which these statements were used during his trial.[16] Although Anderson moved to suppress the March 20, 1999, statements before trial, when the statements were introduced during the penalty phase, he did not object on any of grounds that he had raised in his pretrial motion to suppress or that he is currently raising in his brief. Therefore, his argument is not preserved for review. See Occhicone, 570 So.2d at 905-06; Bertolotti, 514 So.2d at 1096. Moreover, because the statements were introduced in rebuttal to Anderson's penalty phase argument, any improper use of the statements would be entirely distinguishable from cases where a defendant's statements or confessions were introduced as substantive proof of guilt or used as an integral part in securing a conviction during the guilt phase.[17] Under these circumstances, even *182 if the limited testimony regarding Anderson's statements was erroneously introduced, Anderson would have difficulty showing that he was prejudiced. See Almeida v. State, 748 So.2d 922, 931 (Fla. 1999) (applying harmless error test to the erroneous introduction of defendant's taped confession).
Nevertheless, Anderson's claim that the trial court should have granted his motion to suppress fails on the merits as well. This Court has explained:
[A]ppellate courts should continue to accord a presumption of correctness to the trial court's rulings on motions to suppress with regard to the trial court's determination of historical facts, but appellate courts must independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the Fourth and Fifth Amendment and, by extension, article I, section 9 of the Florida Constitution.
Connor v. State, 803 So.2d 598, 608 (Fla. 2001), cert. denied, 535 U.S. 1103, 122 S.Ct. 2308, 152 L.Ed.2d 1063 (2002). At the trial court level it is proper to apply a "totality of the circumstances" analysis when determining if a confession was obtained voluntarily. See Frazier v. Cupp, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); Thompson v. State, 548 So.2d 198, 203-04 (Fla.1989).
Anderson divides his argument into three subissues: (1) Anderson's statements were not knowingly and voluntarily made because he did not understand and law enforcement did not adequately explain his Miranda[18] rights; (2) Anderson's statements were obtained by "promise and improper influence"; and (3) law enforcement officials did not honor Anderson's request to end questioning or his request for counsel. We address each of these subissues in turn.
First, Anderson argues that his statements should have been suppressed because he was not informed that anything he said would be used against him in court and he was not told he was entitled to an attorney free of charge. However, our review of the relevant portions of the transcripts of the March 20, 1999, interrogation refutes both claims and reveals that Anderson was adequately informed of his rights.
Although Miranda warnings must be given to suspects before custodial interrogation can begin, there is no talismanic fashion in which they must be read or a prescribed formula that they must follow, as long as the warnings are not misleading. See California v. Prysock, 453 U.S. 355, 359, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981); Fowler v. State, 263 So.2d 202 (Fla.1972). Anderson was twice read his Miranda rights, once when he was arrested and again when the interrogation began. The transcript from the interrogation reflects that the Miranda warning that Anderson was read included the specific admonishment that anything he told the officers could be used against him in court and that he was entitled to a free attorney. Following the standard Miranda warning, Anderson showed some reluctance when he was asked to sign a written waiver, because he was "not quite clear on it." In explaining Anderson's rights, Detective Jicha told him, "If you say something to me, I'm going to write it down and use it." Anderson argues that *183 this explanation was deficient. However, Anderson, who is college educated, had been specifically told in the standard warning that anything could be used against him in court, and there is no indication that Jicha's additional statement caused Anderson to unknowingly and involuntarily waive his rights.[19]
Second, Anderson also alleges that his statements were not voluntarily made because Anderson made the statements after (1) Jicha promised Anderson that he could call his mother "after we get done" and (2) Jicha exerted improper influence over Anderson by reminding Anderson of their prior dealings. We have held that confessions must be free and voluntary and cannot be extracted by threats of violence or direct or implied promises. See Brewer v. State, 386 So.2d 232, 235 (Fla.1980). However, the transcript of the interview refutes both of Anderson's claims on this subissue as well. During the interview, Anderson stated that he did not need to personally contact his mother; his concern was that someone inform his mother about what had happened. Moreover, the nature of Jicha's statements and questioning could not have given Anderson the impression that the opportunity to contact his mother was contingent on providing statements. In fact, Anderson continued to talk to police after his mother had been contacted. Furthermore, the only reference Jicha made to his prior dealings with Anderson was when he stated, "You know me, I'm pretty fair" while telling Anderson that his mother would be contacted. This limited statement does not imply any promise that would make Anderson's subsequent statements involuntary or coerced.
Finally, Anderson argues that the police should have ceased questioning him after he requested an attorney. In Traylor v. State, 596 So.2d 957 (Fla.1992), we explained:
Once the right to counsel has attached and a lawyer has been requested or retained, the State may not initiate any crucial confrontation with the defendant on that charge in the absence of counsel throughout the period of prosecution, although the defendant is free to initiate a confrontation with police at any time on any subject in the absence of counsel. Because a prime interest protected by the Counsel Clause is the right to exercise self-determination in the face of specific criminal charges, the right to counsel is charge-specific and invocation of the right on one offense imposes no restrictions on police inquiry into other charges for which the right has not been invoked. Evidence obtained by the State in contravention of these guidelines violates the Florida Constitution and may not be used by the State.
Id. at 968 (footnotes omitted).
Moreover, in Almeida v. State, 737 So.2d 520 (Fla.1999), we stated:

*184 [W]e hold that if, at any point during custodial interrogation, a suspect asks a clear question concerning his or her rights, the officer must stop the interview and make a good-faith effort to give a simple and straightforward answer. To do otherwisei.e., to give an evasive answer, or to skip over the question, or to override or "steamroll" the suspectis to actively promote the very coercion that Traylor was intended to dispel.
Id. at 525.
In the instant case, Anderson's request for an attorney was somewhat ambiguous because he stated, "I just don't ... prefer now to wait until there's an attorney." The officers conducting the interview asked Anderson if he was requesting an attorney. Anderson's responses were still ambiguous and the police took a short break. Resuming the conversation, the officer conducting the interview told Anderson:
I guess we just want to make sure okay that you understand your rights and and [sic] if you want a lawyer right now then we're leaving and we're out the door. If you want to talk to us now ya know without a lawyer and answer some new questions that we have and cooperate with us in that respect we want to make sure you have the right to do that as well.
Thereafter, Anderson agreed to continue talking to the officers and stated that he was not being forced to continue answering questions. While the tenor of the officers' comments may have been on cooperating with the police and not cooperating with the police, given the officers' explicit attempt to clarify what Anderson wanted and his decision to continue answering questions, we agree with the trial court's determination that Anderson's rights were not violated. As we noted in Traylor, "the suspect is free to volunteer a statement to police on his or her own initiative at any time on any subject in the absence of counsel." Traylor, 596 So.2d at 966. Therefore, we hold that the trial court did not err in denying Anderson's motion to suppress.

INFLAMMATORY PHOTOGRAPHS
Next, Anderson argues that the trial court erred in allowing the introduction of three photographs of Scott because they were not relevant to any issue in the case and, alternatively, that any relevance was outweighed by the prejudicial impact of the photographs. During the testimony of Gene Cushing, a crime scene technician, the State sought to introduce three photographs of Scott that Cushing had taken at the hospital where Scott was being treated. Cushing took the photographs to document Marisha Scott's injuries as they appeared on March 23, 1999, three days after the robbery. When the State attempted to introduce the three photographs, Anderson's counsel, Mr. Doud and Mr. Stone, requested to approach the bench and the following proceedings took place outside the presence of the jury:
MR. DOUD: Judge, we would object to the introduction of the photographs, I believe it's [State's exhibit] PP. They show the injuries on March 23rd, they don't show the injuries as inflicted or as alleged to have been inflicted by the defendant on the date of the robbery, which would have been March 20th. These show stitching and other repairs, other rescue efforts had been performed on that victim.
THE COURT: Anything else?
MR. DOUD: That's it.
MR. STONE: And cumulative and unduly prejudicial.
MR. GROSS: They're not cumulative, there's no other picture of Marisha is *185 evidence, your Honor. And the argument that he makes to the time delay are medical and only goes to the weight not the admissibility.
THE COURT: Objection is overruled.
Initially, there is a question of whether Anderson's objection to the introduction of the photographs at trial was sufficient to preserve his claim for review. See Pagan v. State, 830 So.2d 792, 812 (Fla.2002) (holding that defendant's claim that inflammatory pictures were improperly introduced was not preserved because defense counsel failed to object to their introduction). Anderson's primary objection at trial was that Scott's wounds had been repaired and stitched and thus the pictures were not reflective of how they looked on March 20, 1999. When asked if there was any other reason for the objection, Anderson's counsel responded, "And cumulative and unduly prejudicial." The State responded that the photographs were not cumulative because no pictures of Scott had been introduced, but did not respond to defense counsel's "unduly prejudicial" remark, and the trial court overruled Anderson's objection. It is difficult to find that Anderson's counsel's simple comment that the pictures were unduly prejudicial, without any elaboration or explanation, preserves his current claim, i.e., that the pictures were irrelevant to any contested issue or alternatively, that their inflammatory effect outweighed any relevance.
Nevertheless, presuming that this bare objection is sufficient to preserve Anderson's claim for review, we hold Anderson's claim to be without merit. We recently explained how trial courts should go about determining the admissibility of photographs of victims and how this Court will treat the determination of admissibility on appeal:
This Court has held that "[t]he test for admissibility of photographic evidence is relevancy rather than necessity." Where photographs are relevant, the trial court must determine whether the "gruesomeness of the portrayal is so inflammatory as to create an undue prejudice in the minds of the jury and [distract] them from a fair and unimpassioned consideration of the evidence." Admission of photographic evidence of a murder victim is within the trial court's sound discretion and is subject to an abuse of discretion standard of review. Nonetheless, this Court has "caution[ed] trial judges to scrutinize such evidence carefully for prejudicial effect, particularly when less graphic photos are available to illustrate the same point." ...
During the guilt phase, this Court has "upheld the admission of photographs to explain a medical examiner's testimony, to show the manner of death, the location of wounds, and the identity of the victim." Moreover, this Court has considered the trial court's preliminary screening as a factor weighing in favor of admissibility.
Philmore v. State, 820 So.2d 919, 930-31 (Fla.2002) (citations omitted).[20] At the point the photographs were introduced in this case, no pictures of Scott had been introduced and she had not yet testified, and, therefore, the pictures were relevant to show Scott's identity. See Larkins v. State, 655 So.2d 95, 98 (Fla. 1995). Furthermore, they were relevant to show the *186 location of Scott's wounds. See id.[21] Therefore, the trial court did not abuse its discretion in allowing the three photographs of the living victim to be introduced.

FORENSIC SEROLOGIST'S TESTIMONY AND PROSECUTOR'S COMMENT
Anderson claims that two errors occurred at trial and that these errors had the cumulative effect of depriving him of the right to a fair trial. First, during the cross-examination testimony of Emily Booth, the FDLE forensic serologist who helped prepare blood evidence for DNA tests, Anderson's counsel asked Booth about the preparation of Anderson's clothing for testing. Booth had cut various pieces of blood-stained cloth from the clothing in order to test the stains. The line of Anderson's questioning went to why Booth had chosen particular stains to test and why she had taken partial cuttings from the clothing. One of the reasons she offered for leaving blood behind on the clothing was to give the defense the opportunity to test the stains. On redirect examination, Booth was asked if she had cut out the entire area of a particular stain, and she responded that she had left some of it. The State then asked Booth if she was a "forensic serologist" and what the term "forensic" meant. Booth responded:
A. Forensic meansit's taking science and applying it to law and in the courtroom setting and I tried to preserve as much of the sample as possible so that additional testing could be done, if need be, by the Defense, if they wanted to hire their own laboratory and do further testing on it, they could. But as a forensic serologist, I'm trying to get the most information out of the stain, while yet preserving the stain.
Q: In case a Defense expert would want to do an independent analysis?
A: That's correct.
Q: And in the forensic world does that happen occasionally, that an expert comes along and wants to analyze the evidence, they can't do that if you consume the entire thing, right?
A: That's correct. And sometimes you have no choice, in the case of the red tee-shirt, it's a very small sample.
At this point in the testimony, Anderson's counsel objected to the State's line of questioning, arguing that it implied that the defense had the responsibility to hire its own serology expert. Anderson requested a curative instruction, and then moved for mistrial, arguing that a curative instruction would not be sufficient. The court denied the motion for mistrial but gave the jury a curative instruction asking them to disregard any suggestion that the circumstance might arise where a defense expert might come in to examine evidence and reminding them that the defense is not required to prove anything. We find that the trial court's curative instruction was sufficient to correct any potential misconception that the jury had about the duty the defense had to rebut the serologist's testimony and the court's decision to deny Anderson's *187 motion for mistrial was not an abuse of discretion.
Anderson's second claim of error is based on a statement made by the prosecutor during closing arguments:
I've come to the conclusion that if I had to put this defense into a category that it doesn't fit in any of the standard categories, what I would call this defense is "the National Enquire [sic] Defense." Inquiring minds want to know.
Ladies and gentlemen, my job is not to satisfy the defendant's curiosity, or his attorneys' curiosity, or the Judge's curiosity, or even your curiosity about these details. I've got one job, one job here today. If you folks have questions that you just have to know the answer to, after this trial is over, my office is up on the fourth floor, you are welcome to come up there and ask me about any of these little details
Anderson objected to the State's closing argument as an improper comment on Anderson's right to counsel, on the validity of his defense, and on matters that were not in evidence. The court overruled the objection but warned the State, "I don't think you need to tell them to come up to your office and talk to you afterwards. I think that is improper."[22]
We agree that the prosecutor's comment that Anderson's counsel was employing "the National Enquire[r] Defense" followed by the suggestion that the jurors come to his office after the trial if they had any questions was improper. See, e.g., Ruiz v. State, 743 So.2d 1, 4 (Fla.1999) (stating that prosecutor "may not suggest that evidence which was not presented at trial provides additional grounds for finding defendant guilty"); Henry v. State, 743 So.2d 52, 53 (Fla. 5th DCA 1999) (holding that it was improper to refer to defendant's version of events as the "most ridiculous defense" the prosecutor has ever heard); Izquierdo v. State, 724 So.2d 124, 125 (Fla. 3d DCA 1998) (improper to refer to defense as a "pathetic fantasy"); Waters v. State, 486 So.2d 614, 616 (Fla. 5th DCA 1986) (improper to refer to defense counsel's closing arguments as "misleading and as a smoke screen").
However, although we agree that the comment was improper, Anderson is not entitled to relief. In order to require a new trial based on improper prosecutorial comments, the prosecutor's comments must
either deprive the defendant of a fair and impartial trial, materially contribute to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise.
Spencer v. State, 645 So.2d 377, 383 (Fla. 1994). The improper comment in this case does not approach the level of improper comments in cases where we have granted relief. See, e.g., Brooks v. State, 762 So.2d 879, 905 (Fla.2000); Ruiz, 743 So.2d at 5. Therefore, Anderson is not entitled to relief on this claim.

PROPORTIONALITY
Anderson argues that his death sentence is disproportionate when compared to other similar cases. Due to the uniqueness and finality of death, this Court addresses the propriety of all death sentences in a proportionality review. See Porter v. State, 564 So.2d 1060, 1064 (Fla. 1990). In conducting this review, this *188 Court considers the totality of the circumstances in a case as compared to other cases in which the death penalty has been imposed, thereby providing for uniformity in the application of the death penalty. See Urbin v. State, 714 So.2d 411, 416-17 (Fla.1998); Porter, 564 So.2d at 1064. The death penalty is reserved for only the most aggravated and the least mitigated of first-degree murders. See Urbin, 714 So.2d at 416; State v. Dixon, 283 So.2d 1, 7 (Fla. 1973).
In the instant case, the jury unanimously voted in favor of a death sentence recommendation and the trial court found four aggravating factors, including two which were given great weight: CCP and prior violent felony for the contemporaneous conviction of attempted murder. In comparison, the trial court found a total of ten nonstatutory mitigating factors, and other than Anderson's lack of a violent history and his religious activities, most of the mitigation was given little weight.[23] Moreover, the trial court properly found four aggravators, including the CCP and prior violent felony aggravators, which are considered among the more serious aggravating circumstances. See, e.g., Larkins v. State, 739 So.2d 90, 95 (Fla.1999) (recognizing the presence of the prior violent felony aggravator as "the most serious" aggravator present in the case and stating that, while CCP was not present, it is one of the "most serious aggravators set out in the statutory sentencing scheme").
Additionally, the facts of this case are similar to other cases with comparable aggravation and mitigation where defendants have received the death sentence. See, e.g., Philmore v. State, 820 So.2d 919, 925 (Fla.2002) (affirming death sentence where trial court found five aggravating circumstances including prior violent felony, CCP, and pecuniary gain and eight nonstatutory mitigating circumstances); Hurst v. State, 819 So.2d 689, 701-02 (Fla. 2002) (affirming death sentence where defendant had robbed fast food store and two aggravators outweighed mitigation); Franqui v. State, 804 So.2d 1185, 1198 (Fla.2001) (affirming death sentence where defendant murdered a law enforcement officer during a bank robbery and trial court found three aggravators: pecuniary gain, prior violent felony, and avoid arrest and minor nonstatutory mitigation); Farina, 801 So.2d at 56 (holding death penalty was proportionate where defendant was a major participant in an armed robbery, had cold, calculated, and premeditated plan to eliminate any witnesses, but did not have a significant prior criminal history); Jennings v. State, 718 So.2d 144, 154 (Fla. 1998) (finding death sentence proportionate where murders were cold, calculated, and premeditated and committed during armed robbery to avoid arrest, but defendant *189 had no significant history of prior criminal activity). Accordingly, we find that death is a proportionate penalty in this case.

APPRENDI CLAIM
Finally, Anderson asserts that Florida's death penalty sentencing scheme is unconstitutional pursuant to the United States Supreme Court's holding in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In a notice of supplemental authority, Anderson filed the United States Supreme Court's opinion in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), in support of his argument on this point. This Court has addressed similar contentions in previous cases and denied relief. See, e.g., Duest v. State, 855 So.2d 33 (Fla. 2003); Lawrence v. State, 846 So.2d 440, 451 (Fla.2003), petition for cert. filed, No. 03-5708 (U.S. July 30, 2003); Chavez v. State, 832 So.2d 730, 767 (Fla.2002), cert. denied, ___ U.S.___, 123 S.Ct. 2617, 156 L.Ed.2d 637 (2003). We find that Anderson is likewise not entitled to relief on this claim. We specifically note that the jury recommended the death sentence by a unanimous vote and one of the aggravating circumstances found by the trial judge was that Anderson had been convicted of a prior violent felony for the contemporaneous conviction of the attempted murder of Scott.

CONCLUSION
Accordingly, for the reasons expressed, we affirm Anderson's conviction and sentence of death.
It is so ordered.
WELLS, PARIENTE, LEWIS, and QUINCE, JJ., and SHAW, Senior Justice, concur.
ANSTEAD, C.J., concurs in part and dissents in part with an opinion.
ANSTEAD, C.J., concurring in part and dissenting in part.
For the reasons I expressed in my opinion in Duest v. State, 855 So.2d 33 (Fla. 2003), I do not agree with the majority's discussion of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). The existence of a prior violent felony aggravating circumstance, by itself, does not constitute a valid basis for rejecting a Ring claim where the actual death sentence is predicated upon important additional findings made by the trial court alone. These additional findings violate Ring's essential holding.
NOTES
[1] Anderson fired ten shots, hitting the victims nine times. The single action revolver was fired six times, and the other revolver four times.
[2] At trial, a second officer testified that he heard Anderson say, "I did it. I did it by myself. I'm by myself" shortly after the police arrived on the scene.
[3] The long caliber revolver was found under the desk in the manager's office.
[4] At trial, the State offered the theory that after shooting the two victims, Anderson went to retrieve the VCR, and while he was doing so he heard noises coming from the vault. According to the State's theory, upon returning to the vault and discovering that the victims were still alive, Anderson hit the victims in the head with the VCR or some other blunt object. In addition to the pathologist's testimony regarding blunt force trauma, Scott testified that she remembered a "black object" coming at her forehead after being shot. The State speculated that this object was the VCR. There was testimony that the VCR was dented, but it was not clear at trial how this damage occurred. Anderson testified he returned to the vault with the VCR, was surprised to see blood coming from Scott's neck, and dropped the VCR.
[5] The four aggravating factors were: (1) the homicide was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP) (great weight); (2) the homicide was committed for pecuniary gain (moderate weight); (3) the capital felony was committed by a person previously convicted of a felony and under sentence of imprisonment or placed on community control or on felony probation (little weight); (4) the defendant was convicted of a previous violent felony (great weight). The previous violent felony aggravator was based on Anderson's contemporaneous conviction for the attempted murder of Scott.
[6] The court considered seventeen mitigating factors: (1) remorse for conduct (moderate weight); (2) cooperation with law enforcement (some weight); (3) strong religious faith (consolidated); (4) past achievements and constructive involvement (consolidated); (5) contributions to community and society through exemplary work (consolidated); (6) loving relationship with family (little weight); (7) employment history (little weight); (8) care for family and community (consolidated); (9) potential for rehabilitation (consolidated); (10) skills to be productive in prison (consolidated); (11) no prior history of violence (substantial weight); (12) well liked in his community (consolidated); (13) sympathetic and thoughtful of people (consolidated); (14) active in his church (consolidated); (15) active in community churches (consolidated); (16) appropriate courtroom demeanor (little weight); (17) willingness to plead (little weight). Because of the interrelated nature of (3), (14), and (15), the trial court considered them as a single mitigating factor which was given substantial weight. Likewise, (4), (5), (8), (12), and (13) were also combined into a single mitigating factor that was given moderate weight. Finally, (9) and (10) were consolidated into a single mitigating factor that was given little weight.
[7] Anderson claims that: (1) the trial court erred in finding CCP as an aggravating circumstance; (2) the trial court erred in finding pecuniary gain as an aggravating circumstance; (3) the death penalty is disproportionate; (4) the trial court erred in considering and weighing mitigating evidence; (5) the trial court erred in allowing testimony with respect to blood stain pattern analysis; (6) the trial court erred in denying Anderson's motion to suppress; (7) the trial court erred in admitting photographs of victim Marisha Scott; (8) the cumulative effect of an improper comment by a forensic serologist and an improper comment by the prosecutor in closing argument violated Anderson's right to a fair trial; (9) Florida's death penalty scheme is unconstitutional in light of the Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).
[8] Anderson argues that Scott's testimony was not credible and that his testimony reflected a more accurate version of events. However, the trial court relied on Scott's testimony in its sentencing order, and to the extent that Anderson's testimony conflicts with Scott's, the trial court was in a better position to make a determination of which version of events to accept. See Stephens v. State, 748 So.2d 1028, 1034 (Fla. 1999) (recognizing "the trial court's superior vantage point in assessing the credibility of witnesses and in making findings of fact"). Moreover, the fact that Scott pleaded with Anderson not to shoot was corroborated by the testimony of Sherry Howard, the woman who had entered the bank during the robbery.
[9] In his brief, Anderson argues that "there was at least a pretense of moral or legal justification. At the very least, he acted in panic." Even if we accepted Anderson's argument that he "acted in panic," there is no merit to the argument that "panic" provides a pretense of moral or legal justification for murder. Cf. Jones v. State, 612 So.2d 1370, 1375 (Fla.1992) (noting that a sense of rejection does not provide a valid pretense of moral or legal justification for killings); Williamson v. State, 511 So.2d 289, 293 (Fla. 1987) (stabbing fellow inmate where victim had made no threatening acts toward defendant did not indicate pretense of justification).
[10] In support of the pecuniary gain aggravator, the trial court found:

The defendant's plan was to rob the bank, deposit the stolen money in another bank, pay his restitution in order to stay out of the Probation and Restitution Center, and then continue to live a normal life. In order to successfully carry out his plan, he had to kill the two eyewitnesses who had observed and talked with him for hours over a two day period.
This Court finds that this aggravator was proven beyond a reasonable doubt and is accorded moderate weight in determining the appropriate sentence in this case.
[11] Over Anderson's objection, Caudill testified that some of the blood stains found in the vault were made by blood traveling at "medium velocity," which was consistent with the victims having been struck with blunt force. On cross-examination, Caudill admitted that the medium velocity spatters could have been created in a number of other ways as well, such as the activities of the emergency personnel or from arterial spurting. Caudill also testified that he could not associate the blood spatters he tested with a specific victim.
[12] An expert is permitted to express an opinion on matters in which the witness has expertise when the opinion is in response to facts disclosed to the expert at or before the trial. § 90.704, Fla. Stat. (1999). Section 90.702, Florida Statutes (1999), requires that before an expert may testify in the form of an opinion, two preliminary factual determinations must be made by the court under section 90.105, Florida Statutes (1999). See Charles W. Ehrhardt, Florida Evidence § 702.1 (2001 ed.). First, the court must determine whether the subject matter will assist the trier of fact in understanding the evidence or in determining a fact in issue. See id. Second, the court must determine whether the witness is adequately qualified to express an opinion on the matter. See id.
[13] Caudill had taken a forty-hour class in blood stain pattern taught by an instructor from FDLE. Although Caudill had not testified as an expert previously, he had conducted blood stain pattern analysis in other cases that had not gone to trial.
[14] Caudill testified that there was a substance on the countertop located inside that vault that appeared to be cosmetics, possibly where a victim's face struck the counter. However, he admitted that he had not tested the substance to confirm whether or not it was cosmetics. Furthermore, Caudill also admitted that he had not tested the blood stains to see if they had come from the same victim, or if there had been a commingling of the victims' blood. In Anderson's motion for a new trial, Anderson again raised the claim that the court improperly allowed Caudill to be qualified as an expert and that the court improperly allowed Caudill to render an opinion without having the necessary factual predicate information to support such an opinion. However, Anderson never raised the claim that Caudill's testimony was so highly speculative that it would confuse the jury or that the prejudicial impact of his testimony outweighed its relevance.
[15] Caudill's testimony provided support for the State's theory that Anderson may have struck the victims with a blunt object after they had been shot. Additionally, the testimony of the medical examiner that both victims had injuries consistent with blunt force trauma and Scott's testimony that she remembered a "black object" coming at her forehead provided evidence that the victims may have suffered some sort of blunt force trauma in addition to being shot.
[16] During the penalty phase, Anderson called detective Linda Green, who testified that Anderson had cooperated with law enforcement to the extent that he admitted to certain aspects of the crime. To rebut Green's testimony, the State called another detective, James Jicha, who was one of the officers who had interrogated Anderson on March 20, 1999. Jicha testified that during the March 20, 1999 interview, (1) Anderson said he did not know why he had two guns; (2) Anderson claimed the VCR cord was ripped because he had tripped over it; (3) Anderson denied that he shot the victims just for the sake of shooting them; (4) Anderson denied that he purposely went into the office looking for the VCR; (5) Anderson claimed he went into the bank to get information about opening an account, but then agreed that he did not have any money to open an account.
[17] The cases that Anderson relies on in making this claim involve situations where confessions or statements were introduced as substantive proof of the defendant's guilt. See, e.g., Almeida v. State, 737 So.2d 520, 526 (Fla.1999); Traylor v. State, 596 So.2d 957, 961 (Fla.1992); Thompson v. State, 595 So.2d 16, 17 (Fla.1992); Brewer v. State, 386 So.2d 232 (Fla. 1980).
[18] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[19] Anderson also argues that his case is similar to Thompson v. State, 595 So.2d 16, 17 (Fla.1992), wherein we held that the Miranda warning given to a defendant was insufficient because it did not explain that the defendant was entitled to a free attorney. However, in Thompson, the defendant specifically stated that he did not have the money to pay an attorney and he was not told that one would be provided free of charge. See id. at 18. In the instant case, Anderson was read a Miranda warning that specifically informed him that he would be provided with an attorney if he could not afford one. Anderson attempts to attribute significance to his statement that he was "not quite clear on it," apparently referring to his Miranda rights, when he initially showed reluctance at signing a written waiver. However, when Jicha re-explained Anderson's right to an attorney, he again stated "[i]f you can't afford one, the court system will appoint you one through the court system." Therefore, unlike the defendant in Thompson, Anderson was plainly told twice that he was entitled to a free attorney.
[20] Although Philmore, and the cases cited therein, dealt with the photographs of murder victims, the same type of analysis is applicable to photographs of a living victim's injuries. See, e.g., Waggoner v. State, 800 So.2d 684, 685-86 (Fla. 5th DCA 2001) (holding that pictures of the living victim's injuries were relevant to issues in the trial and were admissible).
[21] Anderson also argues that the photographs were improperly introduced because the only issue was whether the shooting was intentional. However, this argument is inaccurate. When the pictures were introduced, Anderson had not yet stipulated or testified that he shot Scott. Furthermore, the State had already introduced five pictures of the deceased victim, Young, that were taken at the medical examiner's office. Anderson did not object to the introduction of these photographs and he did not argue, either at trial or on appeal, that these pictures were introduced in error. If the issue at trial had been only whether or not the shootings were intentional, Anderson would have also objected to the pictures of the deceased victim.
[22] The State did not repeat the argument and defense counsel did not object further, ask for a curative instruction, or move for mistrial.
[23] Anderson's argument that his death sentence is disproportionate presumes that the CCP and pecuniary gain aggravating circumstances were improperly found. In support of his argument, Anderson cites two cases where we have struck aggravating circumstances and then found that the death penalty was not proportionate. See Almeida v. State, 748 So.2d 922 (Fla.1999); Thompson v. State, 456 So.2d 444 (Fla. 1984). The same situation is not presented here. In Almeida and Thompson, the death sentence was determined to be disproportionate after we struck inappropriate aggravating circumstances. See Almeida, 748 So.2d at 933-34 (holding that death sentence was disproportionate where, after striking aggravator, defendant was left with a single aggravator and substantial mitigation including "a brutal childhood and vast mental health mitigation"); Thompson, 456 So.2d at 447 (holding that trial court inappropriately found CCP). Furthermore, in Almeida, the jury voted seven-to-five in favor of death, while the jury in Thompson recommended a life sentence that the trial judge improperly overrode. See Almeida, 748 So.2d at 926; Thompson, 456 So.2d at 448.